422

LODGES 743 AND 1746, INTERNATION-
AL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL–
CIO, Plaintiffs-Appellants-Appellees,

v.

UNITED AIRCRAFT CORPORATION,
Defendant-Appellee-Appellant.

LODGES 743 AND 1746, INTERNATION-
AL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL–
CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED AIRCRAFT CORPORATION,
Respondent,

and

Lodges 734 and 1746, International Associ-
ation of Machinists and Aerospace
Workers, AFL–CIO, Intervenors.

Nos. 408, 412, Dockets 72–1936, 72–1937,
72–2072, 72–1935 and 72–2310.

United States Court of Appeals,
Second Circuit.

Argued Nov. 25, 1974.

Decided Sept. 9, 1975.

428

Mozart G. Ratner, Washington, D. C. (Plato E. Papps, Ratner & Driesen, P. C., George Kaufmann, Washington, D. C., Norman Zolot, Hamden, Conn., on the brief), for appellants in Nos. 72–1936 and 72–1937, appellees in No. 72–2072, petitioners in No. 72–1935, and Intervenors in No. 72–2310.

Joseph C. Wells, Washington, D. C. (Michael J. Bartlett, Guy Farmer, John A. McGuinn, Patterson, Belknap, Farmer & Shibley, Washington, D. C., on the brief), for appellee in Nos. 72–1936 and 72–1937, appellant in No. 72–2072, and respondent in No. 72–2310.

Marion Griffin, Atty., NLRB, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief), for petitioner in No. 72–1935, and respondent in No. 72–2310.

Before CLARK,* Associate Justice, and MOORE and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

This extraordinarily protracted litigation is the unfortunate aftermath of a labor

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

strike that commenced some fifteen years ago. Lodge 743, International Association of Machinists and Aerospace Workers, AFL–CIO, is the collective bargaining agent for employees at the Windsor Locks and Broad Brook plants of the Hamilton Standard Division of United Aircraft Corporation; Lodge 1746 represents workers at the East Hartford and Manchester plants of the Pratt & Whitney Aircraft Division of the same Company. These two Lodges will be referred to collectively as the "Union." Pratt & Whitney engages primarily in the manufacture of aircraft engines; Hamilton Standard manufactures primarily aircraft propellers, aircraft engine fuel controls and air conditioning systems, and electronic components, controls and related items. In 1960, when the principal events involved in this litigation transpired, the four plants together employed nearly 20,000 people.

On June 8, 1960, the Union struck these four plants (the International Association struck at other United Aircraft plants in the State of Connecticut as well) over demands sought to be included in a new collective bargaining agreement. The strike lasted nine weeks and was marked by extreme violence and mutual antipathy.[1] It was not settled until Abraham Ribicoff, the Governor of Connecticut, intervened in an effort to induce the parties to reach an accommodation.

As the basis of the strike settlement, the Company and the Union reached accord on new collective bargaining contracts covering workers at the four plants and also agreed to submit to arbitration the cases of 50 strikers accused of serious misconduct. In addition, they agreed on a procedure to govern the recall of strikers to jobs at the four plants. The terms of this agreement were set down in writing by the Company and became embodied in two similar although not wholly identical documents, one covering employees of Pratt & Whitney and the other employees of Hamilton Standard. These documents, each denominated in its caption as a "Strike Settlement Agreement" (herein sometimes termed the "recall" Agreements), are the root of these cases.

Being totally dissatisfied with what ensued with respect to the recall Agreements, the Union sought two avenues of redress. Commencing in November 1960, the Union filed with the NLRB a battery of unfair labor practice charges relating mainly to the Company's allegedly unlawful administration of the recall Agreements and its refusals to supply the Union with certain requested information. On February 7, 1963, the General Counsel of the NLRB issued a consolidated complaint based on the Union's charges. A hearing before a Trial Examiner commenced in 1963 and lasted, with numerous intermittent recesses, until June 1968.

In the meantime, the Union had also filed suit under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, in the United States District Court for the District of Connecticut.[2] The complaints (two suits were eventually consolidated for trial), filed December 11, 1961, alleged breach of the Strike Settlement Agreements and sought specific performance as well as substantial monetary damages. The case ground through discovery, several interlocutory rulings, and a 4½ month trial, and on March 20, 1969, the district court issued a lengthy decision (reported at 299 F.Supp. 877, D.C.Conn.) largely in favor of the defendant, although it did find that the Company breached the agreements in some limited respects. The case then proceeded through a determination of the question of damages to final judgment dated June 16,

1. Strike-related violence caused the Company to file a suit in State court, eventually leading to a judgment in its favor. *United Aircraft Corp. v. Machinists,* 161 Conn. 79, 285 A.2d 330 (1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972).

2. The filing of a suit under section 301 does not oust the jurisdiction of the NLRB to hear unfair labor practice charges arising out of the same conduct. *Smith v. Evening News Assn.,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). However, there may be no double recovery. *See UAW v. Russell,* 356 U.S. 634, 646, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

1972. The judgment incorporated by reference the findings of fact and conclusions of law set forth in the Court's opinion (Memorandum of Decision filed March 20, 1969) and, more specifically as to damages, directed the defendant to pay to plaintiff Lodge 743 and plaintiff Lodge 1746 for distribution to beneficiaries, identified in an appendix annexed to the judgment, amounts described as "Net Monetary Damages" plus interest at 6% from March 20, 1972 (the date of the opinion) except for a deduction therefrom of 15% of the amounts stated which percent was to be paid to the unions for the benefit of retained counsel in the litigation. Other items by way of payment to unemployment compensation and pension funds as well as other employee adjustments were specified.

Claims of all employees except 72 specified in the Appendix were denied and the complaint was dismissed as to them. Legal taxable costs were awarded to plaintiffs.

Four categories of striker-employees held to have been prejudiced by defendant's actions were listed with the name and specific damage award, together with other benefits where appropriate. These were (a) Strikers Prejudiced by Transfers, Promotions or Demotions Into Jobs Vacated by "Summer" Employees; (b) Strikers Prejudiced by Promotions; (c) Strikers Prejudiced by Transfer of "Department 74 Trainees" and (d) Strikers Prejudiced by Lateral Transfers and Demotions From One Seniority Group to Another. The judgment of the district court has not been appealed with respect to all of these categories. See note 25 infra.

On July 25, 1969, the Trial Examiner handed down his ruling in the unfair labor practice proceedings. He concluded that, except in narrow areas paralleling the findings of the district court in the section 301 case, the Company had committed no unfair labor practices in connection with the recall of strikers during the life of the Agreements. He did find, however, that the Company's treatment of unrecalled strikers following the life of the recall agreements did deny them certain rights under the National Labor Relations Act. The Examiner also dismissed Section 8(a)(5) charges that the Company had refused to bargain in good faith by withholding certain information from the Union. The other limited findings of the Trial Examiner will be considered in due course.

On review, the Board adopted the decision of the Trial Examiner with some modification, including a reversal of the Trial Examiner's ruling that the Company had denied the strikers certain rights after the expiration of the recall Agreements. United Aircraft Corp., 192 NLRB 382 (1971).

From these rulings the parties seek review. The Union appeals the district court's ruling in the section 301 suit, claiming that the court erred in nearly all significant respects. The Company also cross appeals with respect to some of the matters determined adversely to it (Nos. 72–1936, 72–1937, 72–2072). In the NLRB proceedings, the Unions have petitioned for review and the Board has cross-petitioned for enforcement of its order against the Company. The Union has also intervened in the enforcement proceeding (Nos. 72–1935, 72–2310).

These cases were argued together and, although dealt with separately in this opinion, are inextricably intertwined.

## I. The Section 301 Suit

### A. General Introduction

The Strike Settlement Agreements called for strikers desiring to return to work to express their intention by registering. Under the terms of the Agreements registration would take place at Hamilton Standard on August 9 and 10, 1960, and at Pratt & Whitney from August 11 to August 13, 1960. Strikers not registering would be treated as having quit and not desiring to return to work. Those strikers who did register would then be recalled in accordance with the provisions in the Agreements. The operative paragraphs are set out in the

margin.[3] The Agreements provided for recall to occur in three phases, corresponding to paragraphs 4(a), 4(b) and 4(c). Under Phase 1, strikers would be returned to their prestrike jobs (i. e. same job code, department and shift) if they were available at the end of the strike. If a striker's prestrike job was not available, under Phase 2 he would then be recalled to certain other jobs then available. Finally, under Phase 3 registered strikers not recalled up to that point would be put on a preferred hiring list and placed in jobs which developed before December 31, 1960, the expiration date of the Agreements, before new employees were hired. The order of recall under phases 2 and 3 was to be governed by the relative seniority of the strikers as provided in the collective bargaining agreements recently ratified by the Union membership as part of the strike settlement.

Pursuant to the terms of the Agreements, a total of 6,536 strikers registered for reinstatement: 4,535 registered at Pratt & Whitney (4,515 at the East Hartford plant and 20 at the Manchester plant) and 2,021 at Hamilton Standard (1,721 at Windsor Locks and 300 at Broad Brook). From that point through the life of the Agreements, reinstatement proceeded generally as follows. At Pratt & Whitney 2,270 registered strikers returned to their identical prestrike jobs under Phase 1, and 793 returned to other jobs under the provisions governing Phase 2. Both of these steps had been substantially completed by early September 1960. The remaining strikers were notified that they had been placed on a preferred hiring list, and from this group 407 were recalled prior to the expiration of the Agreements. Thus, of a total of 4,535 registered strikers at Pratt & Whitney, 3,470 had been returned to work. Of the remaining 1,065 registered strikers, 223 had been removed from the preferred hiring list for other reasons (e. g. resignation), and therefore 842 strikers remained on the list and had not been hired by January 1. 119

3. The Agreement covering strikers at Hamilton Standard provided as follows:

4. Strikers who register in accordance with the above will be returned to work in the following manner:

(a) If the job held prior to the strike (i. e., same job code, department, and shift) is available, the registering striker will be returned to that job.

(b) If such job is not available, strikers will be recalled to comparable or other available jobs in accordance with their seniority and demonstrated ability pursuant to Article VII, Section 1 and Section 2, of the Windsor Locks contract ratified by the union on August 8, 1960, or pursuant to Article VII, Section 1, of the Broad Brook contract ratified by the union on the same date.

(c) Strikers for whom no job is available in accordance with (a) and (b) above will be placed on a Preferred Hiring List and will be recalled to job openings which develop at any time prior to January 1, 1961, before new employees are hired. Employees on such Preferred Hiring Lists will be recalled to job openings in the order of their seniority and demonstrated ability pursuant to Article VII, Section 1 and Section 2, of the Windsor Locks contract ratified by the union on August 8, 1960, or pursuant to Article VII, Section 1, of the Broad Brook contract ratified by the union on the same date.

Separate Preferred Hiring Lists shall be established for returning strikers employed at the Windsor Locks plant and those employed at the Broad Brook plant.

For Pratt & Whitney strikers, the Agreement stated:

4. Strikers who register in accordance with the above will be returned to work in the following manner:

(a) If the job held prior to the strike (i. e. same job code, department and shift) is available, the registering striker will be returned to that job.

(b) If such job is not available, strikers will be treated as if they had been laid off, and will be recalled to other available jobs in their occupational groups and seniority areas in accordance with their seniority, pursuant to Article VII, Section 1 and Section 2, of the contract ratified by the union on August 9, 1960.

(c) Strikers for whom no job is available in accordance with (a) and (b) above will be placed on a Preferred Hiring List and will be recalled to job openings in their occupational groups and seniority areas which develop at any time prior to January 1, 1961 before new employees are hired. Employees on such Preferred Hiring Lists will be recalled to such job openings in the order of their seniority pursuant to Article VII, Section 1 and Section 2, of the contract referred to above.

Separate Preferred Hiring Lists shall be established for returning strikers employed

of these individuals had been offered jobs and either refused the offer or failed to meet the physical requirements.

At the Hamilton Standard plants as well, substantial numbers of strikers remained unrecalled when the Agreements expired. The Company recalled 753 strikers under Phase 1 and 104 under Phase 2. An additional 223 returned to jobs by being drawn off the preferred hiring list under Phase 3, leaving 941 strikers who had not been recalled pursuant to the Agreements. Taking account of resignations, etc., 843 remained on the preferred hiring list, 4 of whom had been offered jobs but who had declined to accept.

In total, therefore, 1,562 (723 plus 839) employees desiring to return to work out of more than 6,500 registered strikers failed to receive offers of reinstatement under the Agreements. Some of these employees (278 at Pratt & Whitney and 177 at Hamilton Standard) were hired by the Company, during the first few months of 1961, but their status was then that of new employees, and they had lost accrued seniority and its attendant benefits. From the Union's standpoint, this level of reinstatement was wholly unsatisfactory, and it is these figures which formed the motivation for the charge that the Company's procedures breached the recall Agreements. According to the Union, the Company employed a variety of tactics designed to minimize the number of jobs available to registered strikers. Chief among these alleged artifices was a plan to depress the complement at the plants until after the Agreements had expired. Included as well were promotions and transfers of active employees to vacancies in preference

to reinstatement of strikers awaiting recall. As noted, the district court rejected nearly all of the Union's contentions.

It is important to recognize that the aggregate figures set out above provide a broad and somewhat oversimplified picture of the recall process. The plants involved were not simple units in which all jobs were completely interchangeable. For administrative purposes plants were divided into separate seniority groups known as "seniority areas," and an employee's seniority (length of continuous service with the company) operated only within his seniority area. At Pratt & Whitney types of job skills were classified into "occupational groups." Hamilton Standard collective bargaining contracts did not utilize the term "occupational group" but substituted the concept of "demonstrated ability" (previous experience in a job that had shown his ability in it). The recall Agreements incorporated this organizational structure, and limited [4] the recall rights of strikers to available jobs and jobs which developed "in their occupational groups and seniority areas" (at Pratt & Whitney) and to jobs in which they had "demonstrated ability" (at Hamilton Standard). Thus, the mere existence of a job vacancy at one of the plants did not automatically mean that a striker had a right to fill the job. If, for example, the vacancy occurred in a seniority area and occupational group for which no strikers were awaiting recall, the Company was entitled under the terms of the Agreements to hire new employees, and in fact this did occur.

■ At this point it is appropriate to consider the standard of review that governs our disposition of this appeal. This

at the East Hartford plant and those employed at the Manchester plant.

4. This interpretation of the Agreements is not undisputed. The Union claims that it is inconsistent with certain representations and commitments made by the Company during the negotiations. It argues that once the list of registered strikers for a particular seniority area and occupational group had been exhausted, strikers awaiting recall in other seniority areas and occupational groups should have been recalled. However, we think that the language of the Agreement is unambiguous

with respect to the extent of the preference they accorded strikers, and any extension of the plain language by implication would be wholly unwarranted.

Nor is this interpretation inconsistent with the directive of *NLRB v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 381, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), that economic strikers are entitled to be reinstated when a job opens which they are "qualified" to fill. The use of occupational groups and demonstrated ability as reinstatement criteria can reasonably be said to accord with this mandate.

was a non-jury contracts case, albeit an exceptionally complicated one made more complex by the necessity of interpreting the contract with a view toward "the policy of our national labor laws." *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Under Rule 52(a) of the Federal Rules of Civil Procedure, we are bound by the factual findings of the district judge unless they are clearly erroneous. And although the district court's interpretation of the contract involves a question of law and is fully reviewable, to the extent that the interpretation depends upon extrinsic facts, we are bound by the findings of the lower court with respect to such facts. *See generally* C. Wright & A. Miller, 9 Federal Practice and Procedure § 2588 at 750–51 (1971).

Besides contending that some of the district court's findings are clearly erroneous, at various points throughout its main brief the Union cites failures of the district court to make specified findings. But it must be remembered that the measure of the district court's duty is not the contentions of the parties.

One function of findings of fact is to aid the reviewing court. *Russo v. Central School Dist. No. 1,* 469 F.2d 623, 628 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973). And if they are sufficiently comprehensive to disclose the steps by which the trial court reached its ultimate conclusion on the factual issues, the findings are adequate. C. Wright & A. Miller, *supra,* § 2579. In this case, perusal of the voluminous record coupled with a glance at the lengthy opinion of the district court reveals the diligence of the district judge and the detailed nature of his findings. That he may have failed to make each and every finding that the parties may deem pertinent is in itself no sign of error.

**B. Complement Depression**

It is an irrefutable fact that during the life of the recall Agreements the total work complement at all Company plants except Manchester (having a total pre-strike complement of only 133 employees) remained significantly below pre-strike levels. Furthermore, there is no question that starting almost immediately after the expiration of the agreements on December 31, 1960, the Company hired significant numbers of new employees, thereby bringing complements up to pre-strike size within several months. The Union contends that the Company deliberately kept the complements at artificially low levels. This alleged tactic, it claims, had the effect of denying reinstatement to some of the strikers, thereby reducing overall labor costs when the Company hired new (and lower paid) employees after January 1, 1961. The district court addressed much of its opinion to the issue of complement depression, concluding that:

> [T]he plaintiffs have failed to prove their allegations that the defendant, or either of its subsidiaries, deliberately and in bad faith depressed the bargaining unit during the life of the Settlement Agreements through December 31, 1960 or that it failed to exercise good faith in the performance of the Strike Settlement Agreements to avoid its contractual obligations. While the plaintiffs placed this question in issue by a prima facie showing, the defendant assumed its burden of going forward and advanced proof which satisfied the Court, that it had acted in good faith and was motivated by legitimate and substantial business justification in the performance of its obligations under the Strike Settlement Agreements.

299 F.Supp. at 912 (footnote omitted). The Union takes issue with these findings and contends, in addition, that even if the Company did not administer the Agreements in *bad faith* it was nevertheless obligated by the Agreements to restore the complements to pre-strike size. We consider first the nature of the Company's obligations under the contract.

**1. Restoration of Full Complements**

The district court did not expressly decide whether embodied in the Settlement Agreements was a commitment that the pre-strike complements would be restored, but its opinion acknowledged the issue and by implication rejected the contention. *See* 299 F.Supp. at 897.

The gist of the Union's argument is that the terms "available" jobs and job openings "which develop" referred respectively to jobs that were not filled by replacements at the end of the strike and to jobs that were occupied at the end of the strike but subsequently vacated by employee terminations. In essence, the contention is that these definitions precluded temporarily reduced complements as a basis for denying jobs to strikers. At least beyond the first few weeks of the settlement, according to the Union, the Agreements took no account of strike dislocations and potential difficulties in the resumption of full production.

The principal basis for this position is the presettlement negotiations between officials of the Company and representatives of the Union. Throughout the talks the Union remained acutely aware of the Company's continuing program of hiring replacements. A principal area of discussion was the number of strikers who would not be reinstated, and Union negotiators requested Martin F. Burke, United Aircraft's Vice President for Industrial Relations, to venture estimates on the number of strikers who would not be returned to work. Burke guessed that between 400 and 500 strikers at Hamilton Standard would have no jobs at the expiration of the strike. At Pratt & Whitney, Burke estimated[5] that the number would be larger.[6] These estimates were admittedly based on the assumption that the plants would again operate at pre-strike complements. But it does not follow that because the number of replacements was of utmost concern to the Union and the existence of

replacements was often discussed as the reason why strikers would not be reinstated, that the Agreements cast aside all business considerations. Indeed, such a construction would be extraordinary since it would require an employer to operate without regard to the necessity of gearing employee levels to output requirements or efficiency. And in fact there are indications in the record that the production requirements of the Company would be a factor in determining the level of striker reinstatement. In discussing the proposed terms of the recall Agreements with International Union President Hayes, Burke explained that the "filling out of any complement that [the Company] needed" would be from the preferred hiring list.[7] At another point, Burke told Hayes that it was the Company's intention to reinstate strikers "as quickly as possible, and take into account the production problem."[8] Thus, strike-related production problems were expressly within the contemplation of the parties, although they could not foresee the extent and duration of the reduced complements. In fact, the Union acknowledges as much but seeks to avoid undermining its interpretation of the Agreements by asserting that "[a]t no time did Burke indicate that 'the production problem' would take more than 'a few weeks' to solve . . . ."[9] But this does not diminish the fact that the Agreements were made under the assumption that business considerations might prevent reinstatement of some strikers, albeit temporarily. That is to say, their jobs would not be "available" within the meaning of the Agreements.

**5.** At a previous meeting on August 5, 1960, with Mr. Hayes, the president of the International Union, Burke estimated that 600 strikers would lose their jobs at Pratt & Whitney. The estimates referred to in the text occurred at a meeting on the following day.

The parties hotly dispute whether these estimates were intended to refer to the number of strikers not "immediately" reinstated (i. e. by approximately the first week of September) or alternatively to those who would not be reinstated by December 31, 1960, at the expiration of the agreements. There is support for both positions; the district court evidently found the

former to be accurate. 299 F.Supp. at 883. We do not dispute that finding, although, like the district court, we do not attach much significance to Burke's estimates. He repeatedly stressed that it was very difficult to make any estimate, and hence his "guesses" must be deemed little more than just that.

**6.** Joint Appendix 296, 302.

**7.** *Id.* 1151.

**8.** *Id.* 1755, 1169–70.

**9.** Appellant's Brief at 45.

That there was not full discussion of temporary cutbacks in employment levels at the plants hardly seems surprising. There were no plans permanently to abolish jobs,[10] and resuming full production as quickly as possible would seem to benefit both the Union and the Company. Thus, their interests would normally not diverge on this point, and post-strike production levels would understandably not be a focal point in negotiations.

Accordingly, we must reject the contention that the Agreements contained an implied obligation to restore full complements. And contrary to the assertions of the Union, this interpretation neither leaves the reinstatement rights of strikers to the untrammeled discretion of the Company nor is inconsistent with national labor policy. The Company was required to exercise good faith in its performance under the Agreements. It could not at its whim keep the complement below pre-strike levels; nor could it do so in order to discriminate against strikers. Rather, the Company could refuse to reinstate strikers only for legitimate and substantial business reasons unrelated to labor relations. *See NLRB v. Fleetwood Trailer Co., Inc.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). We turn now to consider whether the district court was correct in concluding that the Company's maintenance of the complements at reduced size met these criteria.

2. The Administration of the Agreements

█ As noted above, after considering "the totality of the circumstances", the district court found that the Company had not in bad faith depressed the complements during the life of the Agreements. Although the court acknowledged that the

Union had made out a *prima facie* case of bad faith, the Company successfully rebutted this showing, satisfying the court that it had been motivated by legitimate and substantial business considerations. 299 F.Supp. at 912. The Union now attacks that finding as clearly erroneous. It assails the failure of the district court to make express findings on subsidiary matters deemed by the Union to be crucial; and. where the court did detail such findings, the Union contends that its determination is contradicted by other and more believable evidence that the court supposedly ignored. As demonstrated in the following discussion, we cannot agree that the district court was in error.

At both Hamilton Standard and Pratt & Whitney the district court found that strike-caused production imbalances, consisting mainly of parts shortage bottlenecks, were the principal reason for reduced employee complements.[11] The Union contends that this finding cannot stand. It relies heavily on the minutes of the August, September, and October 1960 meetings of the respective Operating Committees of Hamilton Standard and Pratt & Whitney as showing the existence of a "plan" to keep complements depressed until after the expiration of Agreements. The existence of such a plan, the Union contends, is inconsistent with any explanation based on parts shortages.

The district court found little significance in the minutes, *see* 299 F.Supp. at 908, and we wholly concur in this assessment. A study of the minutes shows that they cannot reasonably support the Union's theory of a plan to depress the complements, much less one conceived in bad faith as a retaliatory measure against the registered strik-

---

**10.** In July 1960 the Company had predicted that about 65 jobs would be abolished at Hamilton Standard's Broad Brook plant. (Joint Appendix 2340) However, this subject was never repeated when negotiations resumed.

**11.** Contrary to the contention of the Unions, we do not read the district court's opinion as attributing company employment policies to a desire to maximize profits in 1960, at the expense of overall profitability, by minimizing labor costs to the end of the year. Any such policy on the part of the Company would make little economic sense since labor is the means with which it generates profits. Thus, to avoid hiring people where they could be productively utilized would hardly promote profitability. As we read the pertinent portion of its opinion, the district court was merely observing that business considerations including profit considerations govern the level of employment.

ers. For example, at Pratt & Whitney, Mr. L. C. Mallett, the Chairman of the Operating Committee, admonished department heads to keep expenses at a minimum in order to remain within operating budgets.[12] Mallett's comments appear to reflect nothing more than a generalized corporate concern over minimizing costs and thus insuring profitability. Moreover, there is no indication that his remarks were aimed specifically at the East Hartford plant, the only one where complements remained below pre-strike levels, but rather were directed at all units within the division.

Such discussions, as the minutes reveal took place, concerned the reinstatement of strikers and were nothing more than forecasts of the number of strikers who would be recalled to work in light of the projected manpower needs of the plants. On August 15, 1960, for example, N. B. Morse, personnel manager at Pratt & Whitney, reported that approximately 3,000 of 4,500 registered strikers were back at work and that it was expected that 300–400 more would be recalled before the end of the year.[13] About a month later, Morse again reported that there would most probably be no openings before the end of the year for the approximately 1,200 registered strikers.[14] The Hamilton Standard minutes, although slightly more suggestive, also cannot support an inference of bad faith. The minutes of the August 23, 1960, meeting reveal that "[p]roduction workers totaled 1,750 prior to the strike and the factory intends to hold employment to 1,600 on a 3-shift operation to avoid a 1961 layoff. This will require 20% overtime during 1960." [15] However, the context of the statement reveals that the employment level was dictated by strike-related business disruptions and a parts inventory imbalance. To the extent that this might be considered a "plan" to depress the complement rather than simply a projection of manpower needs, it was one based on business consid-

erations and thus cannot be considered violative of the Agreement. It is clear that there existed no overriding concern with the extent of striker reinstatement; employment levels were not the tail that wagged the dog. Rather, projections were based upon anticipated business conditions.

In contrast to the allegations of the Union, the Operating Minutes are actually supportive of the Company's position that business exigencies kept complements below pre-strike levels. The minutes of the September 19, 1960, meeting at Pratt & Whitney show that the post-strike efficiency of the machine shop at the East Hartford plant was poor, resulting in a "disappointing" level of parts deliveries.[16] The Hamilton Standard minutes for the October 18, 1960, meeting also refer to a "parts deficiency" occurring as a direct consequence of the strike. These were in fact the principal grounds for the district court's conclusion that the Company acted in good faith throughout the recall period.

Although reliance on the Operating Committee minutes is misplaced, the Union does not limit itself to that argument. It contends that quite apart from the existence of any plan, the parts shortage explanation does not hold up under scrutiny. It cannot account for either the pattern of employment during the period of the Agreements—complements at both divisions rather than gradually growing peaked at about Labor Day and thereafter continuously declined (at Hamilton Standard) or at least failed to regain that level before December 31, 1960 (at Pratt & Whitney)—or for the hiring surge that occurred after January 1, 1961.

At this point a brief summary of the principal evidence relied on by the district court is required. To maintain some level of production during the strike, Hamilton Standard subcontracted some 265,000 manhours of work to 22 different firms. In this connection, it also loaned out to the subcon-

12. Joint Appendix 2347, 2349.

13. *Id.* 2350.

14. *Id.* 2352.

15. *Id.* 2356.

16. *Id.* 2350.

tractors the equipment and machinery necessary to accomplish this work. These contracts could not be cancelled immediately upon conclusion of the strike without subjecting the Company to liability for breach of contract. Furthermore, Hamilton Standard could not accept only partially completed goods without releasing the subcontractor from responsibility for defects. These circumstances led to an unbalanced flow of materials that inhibited the return to normal production. Witnesses from Hamilton Standard testified that for this and other reasons there was considerable disruption in the shop; some parts were in short supply, and others were not. The complexities of the situation were such that the production controls systems were unable to cope with them.[17] To combat these difficulties, stop-gap measures were employed that were perhaps detrimental from the long range standpoint of getting back to normal operations but nevertheless served the immediate need of eliminating production bottlenecks. Overtime was utilized where it would be most efficient to continue production with workers already familiar with the particular processes involved and it was anticipated that the need would be temporary in nature.

Besides testifying about Hamilton Standard's production problems, these witnesses denied knowledge either of the existence of a plan to avoid hiring employees until after December 31, 1960, or of a policy of utilizing overtime as a substitute for additional manpower where the need was expected to be permanent. In large part the issue boiled down to a matter of credibility, and the district court could not have helped but be fully aware of the Union's allegations of bad faith and the motivation for Company representatives to distort the truth. But the court apparently credited this testimony, and on the record before us, we are not inclined to upset that finding. Although the Union points to testimony from Company witnesses indicating that parts problems improved progressively throughout the Agreement period, and assert that this admission is inconsistent with the declining complement during the same period, we are not convinced that the contrast exposes a fallacy in the parts shortage explanation. A progressively improving situation would not immediately translate itself into a greater need for employees. Solution of difficulties in a single limited area, although contributing to an overall solution of production problems, would by itself add little of significance. That a single part is added to a fuel control for example, would put that device a step closer to completion, but it still would not make the control ready for testing or shipping.[18]

Furthermore, there is ample evidence in the record to support the district court's conclusion that the increased hiring at Hamilton Standard in early 1961 was prompted by business considerations and was not merely the result of the expiration of the Agreement and the concurrent abolition of the preferred hiring list. Hamilton Standard first publicly indicated the existence of job openings for about 400 skilled machinists and technicians in a press release on January 6, 1961. On the previous day it had also sent letters to registered strikers who had not been recalled inviting them to apply for the openings. Although the speed with which these announcements followed the expiration of the Agreements makes Hamilton Standard's motives suspect, there were other reasons behind the hiring. On December 21, 1960, Hamilton had received a pilot order for full controls for the Pratt & Whitney engines powering the Boeing 727. Although the order initially involved only 6–8 controls, development of such a control requires a great deal of skilled work.[19] It was also hoped that the initial pilot order would lead to more sales, making the initial development phases worthwhile. Hamilton was also in the beginning phases of production and experiencing pressure to get moving on other equipment including a JFC26 control for a Gen-

---

17. *Id.* 591–92.

18. *See id.* 608–10.

19. *Id.* 572–73.

eral Electric engine, and a complex highly classified system for a Pratt & Whitney engine.[20] These factors were all noted by the district court and evidently formed the basis for a conclusion that there were business reasons to undertake hiring of new employees in early 1961. Coupled with the Company's explanation for the level of employment during the Agreement, they provide an adequate basis for the ultimate finding that complements at Hamilton Standard were not depressed in bad faith.

At Pratt & Whitney the explanation for reduced employment levels was similar. During the strike, the Company sought to complete manufacture of engines that had been in the latter stages of production and to continue deliveries insofar as possible. This policy resulted in production line disruption and parts shortages as materials were pulled out of earlier stages in the production line and already-manufactured parts were utilized but not replaced. Thus, upon termination of the strike, return to normal production depended upon depleted supplies of parts becoming replenished. This responsibility fell upon the machine shop, the largest single section of the East Hartford plant and the section that had the task of manufacturing the parts used in the various stages of the assembly process. Without an adequate supply of all necessary parts, there would be a natural depression of the work force required in other sections of the plant. In short, the machine shop was the key to restoration of a full complement.

Prior to the strike the machine shop employed 4,820 people; on December 31, 1960, it employed 4,909, an increase of 89. Moreover, most strikers registering for recall to the machine shop were in fact recalled (1,115 of 1,296). The Company stresses these statistics as showing that it was straining to obtain an adequate supply of parts. The Union, on the other hand, points out that after an initial restaffing resulting in a peak population about Labor Day, the Machine Shop population was actually al-lowed to decline until December when more employees were again added. This pattern, argues the Union, coupled with a marked increase in the machine shop through the first three months of 1961, forecloses the Company's protestations that it was straining to resume full protection.

The trial judge did not draw the inference of bad faith advanced by the Union. He concluded that it was not likely that the Company would repopulate the machine shop, recalling most strikers assigned to that area, if it was simultaneously embarked on a program of complement depression. *See* 299 F.Supp. at 910. The Union's theory depends upon acceptance of the idea that the Company developed an elaborate charade to obtain an ample—but not too ample—level of production. It also ignores the fact that there may have been difficulties regaining normalcy in a section after a bitter and protracted strike, as the Operating Committee minutes reveal were present at the East Hartford Machine Shop.[21] That the district court rejected this scenario was within its proper role as trier of fact.

■ The Union also complains that the trial judge made no finding which would explain the hiring of over 1,700 employees and restoration of a full complement at Pratt & Whitney during the first three months of 1961. There was testimony as to the business reasons therefor and specific findings on the subject were not indispensable. The ultimate question was whether the Company depressed the complement in bad faith during the course of the Agreements. The degree of hiring after January 1, 1961, was important only to the extent that it shed light on the motivation for Pratt & Whitney's actions during the Agreements. The district court made a detailed review of the evidence in concluding that the complement at Pratt & Whitney had not been depressed. By implication in 1961 hirings were not the inevitable result of prior breaches of the Agreements. Under these circumstances, it was not impera-

**20.** *Id.* 567–68, 587–88.

**21.** *Id.* 2350.

tive that the district court detail its findings with respect to this subsidiary matter.

## C. Transfers and Promotions

Throughout all three phases of the Strike Settlement Agreements, the Company's policy was to operate as if the unrecalled registered strikers had been laid off for lack of work. In previous layoff situations the Company had continued to make promotions and transfers among its active employees, and this practice continued also during the recall period.[22] A significant number of these promotions and transfers were into jobs for which registered strikers were still awaiting recall, thereby foreclosing the striker's opportunity to fill that vacancy.[23] The Company's position was that this was an inevitable consequence of following long-established procedure.

The Company's policies were summarized in a memorandum dated September 8, 1960, written by J. E. Vandervoort, personnel manager at Hamilton Standard.[24] The memorandum purported to set out the "ground rules" for handling recall of registered strikers during the term of the Hamilton Standard Agreement. The "ground rules" can be summarized as follows:

1. When a job became available it would be offered first to the most senior active employee who had held the same job before the strike but had returned to a different job at the end. The Company saw the need to "make whole" active employees as its first obligation.

2. The Company would then consider filling the vacancy by transferring another qualified employee, although this method was to be approached with caution.

3. If the job was still unfilled, Hamilton would look to the Preferred Hiring List for a qualified employee in the appropriate seniority area.

4. The Company would then look for a qualified employee from another seniority area who was on the Preferred Hiring List.

5. After these methods had been exhausted, Hamilton Standard would hire outside the Preferred Hiring List.

█ The initial premise of the district court was that it was proper for the Company to administer the Agreements using layoff procedures. However, not all promotions and transfers during the recall period were of precisely the same character, and the court was presented with a myriad of different situations. Although in purely numerical terms it held that most promotions and transfers were proper, it found breaches of the Agreements in instances affecting some 72 registered strikers. The parties have not appealed all of the district court's findings in this area. The Union challenges the district court's resolution of two issues: that the transfer of junior active employees to jobs for which senior registered strikers were awaiting recall did not violate the Agreements; and that promotion and transfer of apprentices to bargaining unit jobs for which registered strikers were awaiting recall did not violate the Agreements. The Company appeals the finding that promotion of junior active employees other than apprentices into jobs for which senior registered strikers were awaiting recall constituted a breach. The Company has not appealed other aspects of the district court's judgment concerning promotions and transfers, and of course, the judg-

---

**22.** A 1959 arbitration award had in dictum prohibited Hamilton Standard from transferring a worker across departmental and seniority area lines when a more senior employee was awaiting recall in the transferee's new area. Insofar as we are aware, this was the only time the Company's transfer policies had become the subject of a grievance proceeding.

**23.** The Union, initially at least, appears to have claimed 137 "blocking" transfers (including promotions) at Hamilton Standard and 387

such transfers at Pratt & Whitney (Joint Appendix 2389, 2390), although there are pencil notations on the pertinent exhibits, making it unclear whether the Union relied on these figures throughout the trial.

**24.** Although the memorandum was written at the start of Phase 3, testimony indicated that the same policies were also followed during the earlier phases of the Agreements. Joint Appendix 622–23.

ment is conclusive with respect to those matters.[25]

The district court's point of departure on the question of promotions and transfers was that the basic intent of the Agreements was to treat registered strikers as if they had been laid off. This was the position that had been advanced by the Company, although the point was vigorously disputed by the Union. Because we are unable to accept the district court's initial premise, our view of the question is somewhat different. Neither however do we accept in its entirety the interpretation of the Agreements advocated by the Union.

The district court based its conclusion that layoff policies should govern the recall of strikers both on the language of the Agreements themselves and on the provisions of the "interlocking" collective bargaining contracts. The latter contained broad "management rights" clauses,[26] which reserved the Company's right to determine when transfers and promotions[27] should be made. Several factors persuade us, however, that the Strike Settlement Agreements restricted somewhat the freedom to promote and transfer that the Company might have enjoyed during a layoff. Perhaps the foremost consideration is that the situation at the conclusion of the strike was fundamentally different than a layoff. As the district court noted, during periods of layoff workers are bumped downward by more senior people whose jobs have been eliminated. See 299 F.Supp. at 917. The result, generally speaking, is that the more junior employees end up being the ones who are out of work.[28] In contrast, employees still out at the end of the strike presumably ranged from among the most senior to the most junior.

Nor does the language of the Strike Settlement Agreements dictate that layoff procedures regarding transfers and promotions should govern. Paragraph 4(a), for example, makes no mention of layoff, and at least initially, recall of strikers bore no relation to post-layoff recall procedures. During Phase 1 strikers were to be recalled to their old jobs, if they were available, without regard to seniority considerations that would govern after a layoff.

Only in paragraphs 4(b) and 4(c) are there any indications that layoff considerations were a factor at all. But an examination of the layoff references demonstrates that they were intended only to fix the order of recall among the registered strikers themselves. The provisions of Article VII, Sections 1 and 2 (Section 1 of the Broad Brook contract) of the respective collective bargaining contracts, referenced in paragraphs 4(b) and 4(c) of the Agreements, are very limited in scope. The operative provisions in each of the contracts is Article VII, Section 1(a). Although the precise terminology differs slightly among the contracts so as to accommodate the varying administrative structures of the plants, the provision in the contract cover-

---

**25.** The findings regarding transfers and promotions not appealed include: that transfers *across* occupational group and seniority areas in preference to senior registered strikers breached the Agreements; that transfers of certain trainees into occupational groups and seniority areas where senior registered strikers were awaiting recall breached the Agreements; that the transfer of junior active employees to jobs for which registered strikers who had previously signed a waiver of their right to be recalled to another job were awaiting recall breached the Agreements; that using junior active employees to fill jobs vacated by summer hires violated the Agreements.

**26.** The "management rights" provision was contained in the "Witnesseth" clause in the preamble to the basic labor agreements. A

"Supplemental Memorandum" executed on August 16, 1960, emphasized that management's prerogatives were not to be limited by arbitration.

**27.** Although the basic labor contracts contained no restriction on the right of the Company to make promotions, the contracts did specify that selections for promotions be made on the basis of "seniority, fitness, and ability of the employee" and that where employees were in all other respects equal, seniority would govern.

**28.** Seniority was not necessarily the sole factor in determining who would be laid off. At Hamilton Standard, demonstrated ability was also a consideration.

ing Hamilton Standard's Windsor Locks plant is illustrative:

> In the case of an indefinite layoff for lack of work, employees shall be laid off from and recalled to specified seniority areas in accordance with their seniority (length of continuous service with the company since the most recent date of hire) and demonstrated ability.

Plainly, the section deals only with the order of recall among those laid off and says nothing about promotions and transfers. In this respect, an omission from the provisions of the collective bargaining contracts expressly incorporated into the Strike Settlement Agreements is significant. Article VII of the respective collective bargaining agreements also contained a clause providing in part:

> Before new employees are hired in a given seniority area, the employees who are still laid off from that seniority area shall first be offered employment in that seniority area . . . .. The company will give consideration to transferring back to his former job and rate an employee who was transferred to a lower-rated job within his seniority area as a result of a readjustment of personnel arising from a layoff.

Had the intention been to incorporate layoff transfer policies into the recall Agreements, it seems likely that the parties would have referenced the one provision expressly dealing with transfers during layoffs.

Furthermore, although paragraph 4(b) of the Pratt & Whitney Agreement provides that "strikers will be treated as if they had been laid off," the same language was deleted from the Hamilton Standard Agreements at the request of representatives from Lodge 743, and a provision stating that strikers would be recalled to "comparable" jobs inserted. The purpose of the change was to insure that it was clear that a striker had a right to return to his old job on a different shift, if it was available. 299 F.Supp. at 900. Presumably during recall from a general layoff there would be no such guarantee. That the Company readily agreed to this change in language [29] negates any purported significance of the "as if they had been laid off" language in the Pratt & Whitney Agreement.

■ Nor, finally, can the Strike Settlement Agreements be read as incorporating by reference all relevant provisions of the collective bargaining contracts negotiated concurrently with them. Had that been the desire of the contracting parties, they could have done so expressly. Instead they chose to cite only a specific portion of them. Under these circumstances it seems proper to apply the well-established rule that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it part of their agreement only for the purpose specified." *Guerini Stone Co. v. P. J. Carlin Construction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916).

But it does not follow that because the Company's transfers and promotions cannot be justified on the ground that they were simply a continuation of a practice long followed during layoffs, they violated the Strike Settlement Agreements. Promotions and transfers are an integral part of any business operation, particularly a large manufacturing plant, and the Agreements were necessarily made against this backdrop. In fact, the Union admits that nothing prohibited the Company from making transfers and promotions during the recall period. It is only promotions and transfers that prevented the recall of strikers which the Unions claim violated the Agreements.[30] The Agreements guaranteed that strikers would be recalled to "available" jobs and jobs "which develop." To that extent, the Union argues, the Agreements limited the Company's freedom of action.[31]

---

29. *See* Joint Appendix 1155–57.

30. Appellant's Brief at 107 n. 128.

31. We read language in paragraph 4(c) of the Agreements giving strikers the right to be recalled "before new employees are hired" as merely establishing an absolute priority over new hires in Phase 3. We do not think that it

While we agree with the Union that the Agreements did act as a limitation upon the Company, we differ on the extent of that limitation. At trial, the Company claimed that transfers and promotions were necessary to contend with the imbalances caused by the strike. In other words, work might dry up in one particular area, but at the same time, openings would develop in another where registered strikers were perhaps awaiting recall.[32] If the Agreements were construed as prohibiting promotions and transfers to fill those openings, the Company argued that it either would be faced with the necessity of laying off active employees while concurrently recalling strikers or would have more workers on its payroll than it could productively employ. The Union contends that the Agreements required the Company to recall the registered strikers under these circumstances and to make the layoffs if they were indeed necessary.[33] We consider that interpretation of the Agreements to be unreasonable. The Company was not required to recall a striker where to do so would result in the layoff of an active employee.[34] There is no reason why the consequences of the production imbalance caused by the strike should have been visited upon the active employees

who were themselves exercising a section 7 right by refraining from collective activity. 29 U.S.C. § 157. The Company's right to make promotions and transfers to deal with the problem of imbalance and keep its employees productively employed was embodied in the terms "available" jobs and jobs "which develop." As we have seen, these terms carried the implication that strikers would not be recalled until their services could be productively employed. They permitted, in our view, the Company's reshuffling of its productive resources so as to permit their most efficient utilization. No case insofar as we are aware, has required an employer to lay off its active employees so as to make room for strikers. And any such approach would be fundamentally inconsistent with an employer's right to hire permanent replacements for strikers and retain the replacements after the strike while the strikers remain out of work. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).[35] On the other hand, where a promotion or transfer was made not to correct a production imbalance and the effect of the promotion or transfer was to deny recall to a striker or cause a striker to be recalled to a lower labor grade than he

denotes unrestricted freedom to promote and transfer active employees so as to frustrate the right of strikers to be recalled to jobs "which develop."

32. Joint Appendix 627–29.

33. Appellant's Brief at 108–09.

34. The Union acknowledges that recall of a striker was not required in the cases where the active employee was senior to the registered striker. This is necessarily so, since the collective bargaining agreements, which made seniority the generally governing factor in layoffs, would not permit the layoff of a senior (in this case also "active") employee while a more junior employee (the registered striker) was recalled and retained in an active position.

35. It would not make sense to allow an employer to hire permanent replacements during a strike and, in effect, give those replacements post-strike employment preference over strikers, but then require that those replacements be laid off as a result of production adjustments made necessary by the same strike.

Furthermore, contrary to the Union's suggestion, an interpretation of the Agreements upholding the Company's promotion and transfer policy is not contrary to *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). There the Supreme Court upheld the Board's determination that an employer's granting of twenty years super-seniority to striker replacements and strikers who returned to work during the strike was inherently discriminatory and destructive of employee rights and violative of the Act. The Court noted, *inter alia,* that super-seniority by offering exceptionally great job security to employees who returned to work undermined the strikers' mutual interest and dealt a crippling blow to the strike weapon. Furthermore super-seniority created a cleavage in the plant that would continue long after the strike was over. *Id.* at 230–31, 83 S.Ct. 1139. In contrast, the promotions and transfers had no effect on the strike itself and caused no such lingering ill-effects within the plant except in the same sense that *Mackay* might engender embitterment by permitting some strikers not to be reinstated.

otherwise would have, the action constituted a breach of the Agreements because it denied an available job to a registered striker.[36]

Although we cannot on appeal determine the precise effect of this interpretation of the Agreements on the award of damages made by the district court, we can measure the effect in general terms. A more precise determination must be made on remand when the district court makes the findings hereinafter described.

We consider first the lateral transfer or demotion of junior active employees to positions within the same seniority area for which senior registered strikers were awaiting recall. The district court found that such transfers did not breach the Agreements, and the Union has appealed this ruling.

■ At Pratt & Whitney, recall under the Agreements was by seniority area and occupational group. Transfers made for the purpose of correcting a production imbalance and avoiding a layoff of an active employee were permissible under the Agreements, as we have indicated. However, even transfers made for other purposes would not have had the effect of denying reinstatement to a registered striker, since they would have necessarily had the concomitant effect of opening up positions within the same occupational group and seniority area which the registered strikers could fill. Accordingly, we can perceive no basis for concluding that transfers at Pratt & Whitney could have injured a registered striker in contravention of the Agreement.

■ At Hamilton Standard the concept of "demonstrated ability" rather than "occupational group" was used to determine right of recall within a seniority area. Therefore, it is not inevitably true that a transfer within a seniority area, not made as a production adjustment to avoid a lay-off, would open up a position for a registered striker. If at Hamilton Standard a junior active employee was transferred to a different position in preference to a senior registered striker who was awaiting recall to that position, and the striker had no "demonstrated ability" in the vacated position, the effect would have been to deny reinstatement to a registered striker. If such a transfer was not necessary to correct a production imbalance, it constituted a breach of the recall Agreement. As a practical matter, unless the Company was acting in bad faith with the specific purpose of denying reinstatement to registered strikers, something the district court found that the Company did not do, it seems unlikely that it would demote or laterally transfer employees where they could be used productively in their present positions. Consequently, in all probability, transfers at Hamilton Standard did not violate the Agreement as we have interpreted it. Nevertheless, on remand the Union should have an opportunity to demonstrate that some transfers were made for purposes other than to correct production imbalance, and where such a transfer blocked the recall of a senior registered striker to recover appropriate damages.

With respect to the promotions of junior registered strikers, the district court found that 45 senior registered strikers (14 at Pratt & Whitney and 31 at Hamilton Standard), were entitled to damages, and the Company appealed this ruling. At Pratt & Whitney, essentially the same analysis applies as in the case of transfers. Promotions within the same seniority area and occupational group which were not made as a necessary production adjustment would, like transfers of the same sort, have opened up a position for a registered striker in the promotee's vacated position. Thus, such a promotion would not have denied reinstatement to a registered striker altogether. However, unlike the case of transfers, some

---

**36.** Mr. Vandervoort, personnel manager at Hamilton Standard during the recall period, testified at trial that he considered the matter of "optional" transfers ("in other words, if we had work for him where he was") to be sensitive matters. He also indicated that "probably" the only reason that active employees were transferred and promoted to jobs registered strikers were qualified to fill was to avoid layoffs. Joint Appendix 627–28.

registered strikers may, as a result of these promotions been recalled to lower paying positions than those to which they would have been entitled absent the unauthorized promotion. Accordingly, the district court should determine which, if any, of the 14 blocking transfers at Pratt & Whitney were prompted by a need to adjust production and avoid layoffs. Any such promotions did not breach the recall Agreement.

Likewise, at Hamilton Standard, the district court must determine which of the 31 promotions that denied reinstatement to registered strikers or caused them to be returned to lesser positions were caused by production needs and which were motivated by a desire to reward an employee for good performance or were for some other purpose not related to a necessary production adjustment.[37] Only the latter type of promotion constituted a breach of the Agreement.

 A similar analysis governs promotions to apprentices to jobs for which registered strikers were awaiting recall. As found by the district court, promotion to a bargaining unit job was the culmination of a three-year contractual period of training during which the apprentice became certified in a particular skill. 299 F.Supp. at 923. The Union has appealed the ruling that these promotions did not violate the Agreements. The Company was not obligated to lay off the apprentice after the completion of his period of training on account of the unsettled production conditions created by the strike. Nor was it obligated both to promote the apprentice and recall a striker to the same position, resulting in a surplus of employees. Accordingly, we affirm the finding that promotions of apprentices did not breach the Agreements.

 Summarizing our holding with respect to the issue of promotions and transfers of junior active employees, we find that lateral transfers, demotions, and promotions made for the purpose of correcting production imbalances and avoiding layoffs where work in a particular area ceased to be available did not constitute breaches of the Strike Settlement Agreements. Personnel adjustments made for other reasons that had the effect of blocking reinstatement altogether or causing a striker's reinstatement to a lower position, on the other hand, did violate the Agreements. We have determined that no transfer or demotion made at Pratt & Whitney would have had the effect of depriving a registered striker of reinstatement, and therefore, the district court on remand need not consider transfers and promotions at Pratt & Whitney. At Hamilton Standard, however, we cannot say to a certainty that no blocking transfers were made for purposes other than to correct a production imbalance, and therefore it is open on remand for the Union to show that such transfers did occur and that they deprived a registered striker of reinstatement.

With regard to the 45 promotions found by the district court to have breached the Agreement, the district court should inquire into the reasons for these promotions. If they were made simply as a matter of personnel policy and not as a production adjustment, then the promotions were indeed breaches of the Agreements, as the district court found. If, on the other hand, the promotions were necessary production adjustments caused by post-strike production conditions, these promotions did not violate the Agreements.

The district court's determination with respect to apprentices is affirmed.

### D. Preference for Non-striker Absentees

 There were a significant number of non-strikers who nevertheless remained absent during the course of the strike (the

---

**37.** Recalling a striker to fill the vacancy would not necessarily have the effect of denying advancement to the man who would have been promoted. After the striker had been restored to his job, the Company would have been in a position to make readjustments, within the terms of the collective bargaining contracts, to account for the fitness and ability of its workers.

absence having commenced either before or during the strike) because of illness, fear of violence, or other personal reason.[38] All of these individuals desiring continued employment with the Company were immediately reinstated at the conclusion of the strike. The district court found that this practice did not violate the Agreements, since during non-strike periods the Company would have regarded the reasons given as justifying an absence. 299 F.Supp. at 897. The district court also found no evidence that the Company had used this procedure as a means of discriminating against particular strikers.

We agree with the conclusion of the district court. The Strike Settlement Agreements were silent on the issue of non-striker reinstatement, and an inference that non-strikers were by implication subject to its terms is unwarranted. The jobs of economic strikers were subject to being lost either because permanent replacements were hired or for other legitimate and substantial business justification. The Union and the striking employees were well aware of this risk. In contrast, there is no indication that those absent for valid personal reasons during non-strike periods risked losing their jobs.[39] It would have been manifestly unjust to expose them to the same risks as strikers merely because of the fortuity that the cause of their absence occurred during a strike. Indeed, we do not believe that strikers would reasonably have expected that these non-strikers would be treated in the same manner with respect to reinstatement.

█ The same can be said for those employees who were absent during the strike out of a bona fide fear of violence. These individuals did not voluntarily encounter a risk of loss of their jobs, and it would be unfair to treat them identically with those who did.

█ Interpreting the Agreements as not controlling the reinstatement of non-striker absentees is not, in our view, inconsistent with cases holding that an employer may not discriminate between strikers and non-strikers in declaring eligibility for certain benefits. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Frick Co.*, 397 F.2d 956 (3d Cir. 1968). While strikers have a right to expect that engaging in protected collective activity will not subject them to discriminatory treatment with respect to benefits, reinstatement must stand on a different ground for the reason that in leaving their positions vacant, strikers knowingly take the risk that their position will not be available at the strike's conclusion.

### E. Prejudgment Interest

Although our analysis of the Strike Settlement Agreements requires reconsideration of the amount of damages, we take up the issue of prejudgment interest for the district court's future guidance.

Final judgment in this case was dated June 16, 1972. The district court awarded prejudgment interest on the recoverable damages from March 20, 1969, the date of the filing of its principal opinion containing its findings of fact and conclusions of law. The court chose that date because that was when the damages could be "ascertained as a liquidated sum." *Lodge 743, International Ass'n of Machinists v. United Aircraft Corp.*, 336 F.Supp. 811, 815 (D.Conn.1971).

The Union contends that interest should have been awarded from the dates of the violations of the contract. They point to the policy of the National Labor Relations Board to award interest on its backpay

---

**38.** Although the Union contends that there were 170 of these individuals, the Company disputes this figure, and the district court made no finding on the point.

**39.** Of course, absence from work because of personal reasons unrelated to the strike or fear of violence is not protected activity, and had the Company chosen to terminate these individuals, nothing in the National Labor Relations Act would have prevented it from doing so. *See NLRB v. Union Carbide Corp.*, 440 F.2d 54, 56 (4th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971).

awards[40] and argue that the same remedy should apply in Section 301 suits for violations of labor contracts. This conclusion, it is urged, follows from the decision in *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), holding that courts are to apply federal law in section 301 suits, looking to the policies behind our national labor laws in order to fashion appropriate rules. For the same reasons the Union argues that the district court should follow the NLRB practice of computing back pay on a quarterly basis, rather than make a single computation covering the entire period of unemployment.[41]

We of course agree that the decision whether to award prejudgment interest is governed by federal law, although it may be proper, as a matter of convenience, to look to state law in order to determine the appropriate rate.[42] But from this premise does not flow the conclusion that remedies adopted by the NLRB are to be mechanically adopted by the courts in section 301 actions. Whether to award prejudgment interest in cases arising under federal law has in the absence of a statutory directive been placed in the sound discretion of the district courts. *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 516 F.2d 172, 190–91 (2d Cir. 1975); *Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Associates, Inc.,* 496 F.2d 1255, 1268–69 (4th Cir.), *cert.*

*denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974) (securities laws); *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973) (securities laws); *Wessel v. Buhler,* 437 F.2d 279, 284 (9th Cir. 1971) (securities laws); *Norte & Co. v. Huffines,* 416 F.2d 1189, 1191–92 (2d Cir. 1969), *cert. denied sub nom. Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970) (securities laws); *Ross v. Licht,* 263 F.Supp. 395, 411–12 (S.D.N.Y.1967) (securities laws); *The Wright,* 109 F.2d 699 (2d Cir. 1940) (admiralty). There seems no sound reason why we should not take the same approach in suits under section 301 rather than rigidly adopt the identical remedies employed by the NLRB on actions involving unfair labor practices.[43] The Board's remedial rules are themselves not explicitly embodied in a statute; they are the product of the discretion that is vested in the Board to devise remedies to effectuate the policies of the Act. 29 U.S.C. § 160(c); *see NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). As such, they are subject to modification in order to conform to the circumstances of particular cases. *Id.* To be sure, it is proper in a section 301 case for a district court to look to the remedial policies of the Board for guidance. And this is so particularly where, as here, any damage award closely resembles the standard Board remedy of back pay. But the decision must remain that of the district court, and it is

**40.** *Isis Plumbing & Heating Co.,* 138 NLRB 716 (1962). The *Isis* rule was upheld in this Circuit in *Reserve Supply Corp. v. NLRB,* 317 F.2d 785, 789 (1963). It has also been upheld in at least seven other circuits. *See NLRB v. Local 138,* 385 F.2d 874, 878, n. 22 (2d Cir. 1967), and sources cited therein.

**41.** *F. W. Woolworth Co.,* 90 NLRB 289 (1950). The adoption of this policy was upheld by the Supreme Court in *NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 347–48, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

**42.** *Cf.* 28 U.S.C. § 1961 (1970), which provides for post-judgment interest at the rate mandated by state law. Contrary to the argument of the Company, 28 U.S.C. § 1961 relates only to interest recoverable on the judgment itself and says nothing whatever about whether prejudg-

ment interest is appropriate in a given case. *Louisiana & A. Ry. Co. v. Export Drum Co.,* 359 F.2d 311 (5th Cir. 1966).

**43.** A variation of this approach has been taken in the one case of which we are aware that deals expressly with the question of prejudgment interest in suits under section 301. *De Arroyo v. Sindicato de Trabajadores Packinghouse,* 425 F.2d 281, 290 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970). The court refused to award prejudgment interest on a jury verdict for lost wages because the verdict would be too imprecise as to dates and amounts. However, the court indicated that award of prejudgment interest would be proper where the court could make such determinations.

not compelled to follow the policies of the NLRB. In suits for breaches of labor agreements, as in other areas, a vital ingredient in the determination whether to award prejudgment interest is a desire to make whole the party injured by the breach, but in appropriate circumstances, compensatory principles "must be tempered by an assessment of the equities." *Norte & Co. v. Huffines, supra,* 416 F.2d at 1191; *see Board of Commissioners v. United States,* 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1943). ("[Interest] is denied when its exaction would be inequitable.") Although we are of course unable to anticipate the myriad factual situations which might arise, such factors as inordinate delay in prosecution of a suit or wrongdoing by the plaintiff could well give a district court pause before awarding prejudgment interest.

Whether to compute interest on a quarterly basis also should remain within the discretion of the district court. The NLRB adopted this method of computation chiefly to cure the conflict with the Board's reinstatement remedy that occurred whenever a wrongfully discharged employee later obtained a higher-paying position with a new employer. The employee was faced with a Hobson's choice of either waiving his right to reinstatement, thereby terminating the period for running of back pay, or retaining a future hope of reinstatement while seeing his back pay award steadily diminish. *See NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). Although similar circumstances would normally not be present in a section 301 action for damages, there may be times when the remedy will be appropriate, such as when an employer intentionally uses dilatory tactics in defending a suit solely to reduce the potential damage award.

Because the district court here did not approach the issue of prejudgment interest as a matter within its sound discretion, we are constrained to remand the question for reconsideration in light of this opinion. The district court applied the rule that prejudgment interest is not recoverable on an unliquidated sum that is incapable of ascertainment. *See, e. g.,* Williston on Contracts § 1413 (3d ed. 1968). Since the extent of the Company's liability for breach of contract, if any, was not known until the filing of the opinion on March 20, 1969, the court ruled that interest was collectible commencing on this date. But the rule applied by the district court is certainly not a rigid one, precluding altogether the award of such interest. *In re Paramount Publix Corp.,* 85 F.2d 42, 45 (2d Cir. 1936). Rather, the fact that the sum on which interest was to be awarded remained unliquidated until March 1969 was itself reason for the district court to exercise its discretion. *See Norte & Co. v. Huffines, supra,* 416 F.2d at 1191; Restatement of Contracts § 337(b).

The district court seems also to have based its decision not to grant prejudgment interest from the dates of breach on the Company's good faith and innocence from "unlawful, wrongful, and vexatious conduct." 336 F.Supp. at 813–14, *citing United Protective Workers v. Ford Motor Co.,* 223 F.2d 49, 53, 54 (7th Cir. 1955). However, awards of prejudgment interest are essentially compensatory, *Norte & Co. v. Huffines, supra,* 416 F.2d at 1189–91, and wrongdoing by a defendant is not a prerequisite to an award.

The district court may wish to take into account the foregoing considerations, and therefore we remand the question of allowable interest for such consideration as the district court may deem appropriate.

## F. Costs

In its final judgment, the district court awarded costs to the plaintiff Union. The Company contends that this action was an abuse of discretion in view of the fact that the plaintiffs were successful in proving breach of contract only with respect to 72 strikers out of a total of 3,503. We disagree.

Rule 54(d) of the Federal Rules of Civil Procedure provides in part that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs

. . . ." It is axiomatic that a plaintiff need not sustain his entire claim to be regarded as the prevailing party. *See* 6 Moore's Federal Practice ¶ 54.70[4] (2d ed. 1974). Here, although the Company characterizes the violations found by the district court as "minor" or "technical," the plaintiffs were awarded a judgment in excess of $310,000, a substantial sum by any standard. The district court may well have been within the bounds of its discretion if it had apportioned costs between the parties, but it chose not to do so and we cannot say that this decision was improper.

In accordance with the foregoing discussion, the judgment of the district court is affirmed except as to its conclusions regarding the transfer and promotion of junior active employees and the determination to award prejudgment interest only from March 20, 1969. The case is remanded to the district court to make the findings outlined in Part I.C. of this opinion and to allow the district court the opportunity to reconsider its position on prejudgment interest in light of Part I.E. of this opinion.

The Company will be awarded three-fourths of its costs incurred in connection with this appeal.

## II. The Decision and Order of the National Labor Relations Board.

### A. General Introduction

A hearing before a Trial Examiner was conducted intermittently for a period of five years from 1963 to 1968. Although the NLRB proceedings were somewhat broader in scope than those before the district court, in substantial part the NLRB proceedings also involved the Company's administration of the Strike Settlement Agreements. The factual allegations were essentially the same, and only the legal conclusions sought to be drawn were different: before the Board the Union (and the General Counsel) urged that the Company's conduct amounted to unfair labor practices rather than breaches of contract.

The hearing finally terminated in June 1968. By this time, the trial in the section 301 suit had been concluded, although the district court had not yet rendered a decision. The record in the 301 suit had also been placed in the judicial notice file after the Trial Examiner had sustained the Company's objection to a Union and General Counsel motion to admit the entire record into evidence.

The Trial Examiner issued his 138-page decision on July 25, 1969, approximately four months after the district court had handed down its ruling finding that the Company had not breached the Strike Settlement Agreement except in certain limited respects. As to the period from the end of the strike to December 31, 1960, the expiration date of the recall Agreements, the Trial Examiner also ruled generally in favor of the Company. However, the Trial Examiner held that the Company had violated section 8(a)(3) of the Act by cutting off (as provided in the Agreements) the preferential hiring rights of strikers on December 31, 1960. He ruled that strikers not recalled by that date were entitled to preferential hiring treatment through April 1961, when full complements had been restored at all plants.

On review of the Trial Examiner's decision, the NLRB adopted his findings and conclusions with some modification, the most important being the Board's conclusion that in the course of negotiating the Strike Settlement Agreements, the Union had bargained away the reinstatement rights of those strikers who had not been rehired by the expiration date of the Agreements. Thus, the Board reversed the finding that the Company had violated Section 8(a)(3) by not continuing preferential hiring of strikers past December 31, 1960.

The other pertinent findings of the Trial Examiner and the Board will be summarized in due course.

### B. Right to Reinstatement Following the Termination of the Strike Settlement Agreements

Any discussion of the reinstatement rights of economic strikers must begin with *NLRB v. Mackay Radio & Telegraph Co.,*

304 U.S. 333, 345–46, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). There the Supreme Court upheld the right of an employer to hire permanent replacements for strikers and to retain the replacements at the conclusion of the strike even at the expense of not reinstating the strikers.

■ At the outset, it is appropriate to deal with the Union's contention that none of the strikers involved in this case had been permanently replaced. This argument is premised on the fact that the Company did not designate by name the man or woman whom a new hire replaced. We find the contention to be without merit.

■ An employer may not of course avoid reinstating strikers by the use of "pretextuous 'permanent replacements'", *International Association of Machinists, District No. 8 v. J. L. Clark,* 471 F.2d 694, 698 (7th Cir. 1972). The employer must establish that new hires in fact occupied positions formerly filled by strikers. But it does not follow that the employer must identify the replaced striker by name, although such a practice might be desirable as one means of helping to avoid post-strike disputes. Merely naming the striker supposedly replaced would not necessarily be dispositive of the issue of permanent replacement anyway, since the striker could always contend that the naming of an individual was a pretext to avoid reinstating him and that his job was not in fact occupied by the new hire. Here new hires at the end of the strike were assigned to jobs according to job code, department, and shift, just as the strikers had been. Neither the fact that particular strikers replaced were not identified by name nor the difficulty of identifying those employees whose jobs were occupied by new hires means that none had been permanently replaced. This was not a scheme to discriminate among strikers; the order of recall was fixed by agreement. As a practical matter, it made no difference whether a striker's job was filled by a replacement or was unavailable for other reasons. Some of those strikers who remained unreinstated on December 31, 1960, had undoubtedly had their jobs filled by replacements before the end of the strike; others were not recalled because reduced post-strike complements caused their jobs to be unavailable until after the expiration of the Agreements. In either event, the strikers would be recalled in accordance with the terms of the Agreements.

■ The status in the courts of such agreements has been well and succinctly summarized in the Supreme Court's opinion in *Retail Clerks v. Lion Dry Goods, Inc.,* 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962), Mr. Justice Brennan stating for the Court:

"Contract in labor law is a term the implications of which must be determined from the connection in which it appears." *J. I. Case Co. v. Labor Board,* 321 U.S. 332, 334 [64 S.Ct. 576, 88 L.Ed. 762]. It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. It came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the working conditions of the employees of both respondents. It effected the end of picketing and resort by the labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship. Plainly it falls within § 301(a). "[F]ederal courts should enforce these agreements on behalf of or against labor organizations and . . . industrial peace can be best obtained only in that way." *Textile Workers Union etc., v. Lincoln Mills,* 353 U.S. 448, 455 [77 S.Ct. 912, 1 L.Ed.2d 972].

Many decisions subsequent to *Mackay, supra,* have elaborated on the rights and duties of employers with respect to the reinstatement rights of economic strikers. There should be little reason to look beyond the terms of the Agreements for a definition of the rights of the parties after December 31, 1960, but for two decisions handed down seven and eight years later.

In *NLRB v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), the Supreme Court, reversing a 2–1 decision of the Ninth Circuit, held that economic strikers whose jobs were temporarily unavailable at the time they applied for reinstatement were entitled to an offer of re-employment "[i]f and when a job for which the striker is qualified becomes available . . . ." *Id.* at 381, 88 S.Ct. at 547. The court relied particularly on the fact that under the Act a striker remains an employee until he has obtained "other regular and substantially equivalent employment," 29 U.S.C. § 152(3) (1970), and therefore reasoned that the right to reinstatement was not dependent on job availability at the time of application.

■ After the decision in *Fleetwood*, the NLRB extended the rationale of that case in favor of strikers who had been permanently replaced but whose jobs subsequently became vacant because of the departure of the replacements. The Board held that such strikers were entitled to reinstatement unless they had acquired sub-stantially equivalent employment elsewhere. *The Laidlaw Corporation,* 171 NLRB 1366 (1968), *enforced,* 414 F.2d 99 (7th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). *Laidlaw* represented a departure from the Board's previously well-settled rule that an employer who had permanently replaced an economic striker was thereafter under no obligation to treat the striker as anyone other than a new applicant for employment. *E. g., Brown & Root, Inc.,* 132 NLRB 486 (1961), *enforced,* 311 F.2d 447 (8th Cir. 1963). This Circuit is among those which have unanimously ruled that *Laidlaw* was a permissible extension of the Supreme Court's decision in *Fleetwood. H. & F. Binch Co. Plant of Native Laces and Textile Division of Indian Head, Inc. v. NLRB,* 456 F.2d 357 (2d Cir. 1972).

The Trial Examiner found that *Laidlaw* mandated continuation of the preferential hiring list past December 31, 1960. The Board reversed on the ground that such rights had been bargained away by the Union.[44] The Board saw the Strike Settle-

---

44. The Board stated:

In considering whether to modify Respondent's obligation as defined in the recall agreement in view of *Laidlaw,* we have considered the following factors. The recall agreement was one of three agreements negotiated by the parties in order to settle the issues arising from the strike. The strike was an economic strike. On behalf of the employees and the Unions, the agreements were negotiated by top officials of the Charging Parties who were experienced, competent, and knowledgeable. In order to reach agreement on disputed issues, Respondent made concessions which it might not have been willing to make if it knew that the Charging Parties would repudiate part of the recall agreement. The Charging Parties have accepted the benefits of the agreements; in fact, they have sued Respondent for breach of the recall agreement. The recall agreement was entered into by Respondent in good faith. It has also been performed in good faith by Respondent. The recall agreement did not represent an attempt by Respondent to undermine the Union. By contemporaneously signing a new collective-bargaining contract with the Unions, Respondent guaranteed the continued representative status of the Unions for the life of the new contract without regard to the number of strikers who might not be reinstated. More-over, *Laidlaw* was not decided until 1968. At the time the recall agreement was signed in 1960, the prevalent rule could reasonably have been regarded as having been that an economic striker's right to full reinstatement was determined as of the time that he made his application for reinstatement, and if no vacancy then existed, the employer was not required to place his name on a preferred hiring list. Thus in agreeing to give striker's for whom jobs were not immediately available preferred hiring status for approximately 4½ months after termination of the strike Respondent gave them reinstatement rights which exceeded the requirements of the law as it was then understood.

If, as the Supreme Court has held, an employer can unilaterally terminate the reinstatement rights of economic strikers for legitimate and substantial business reasons, it would seem that such rights should also be terminable by agreement between the employer and the bargaining representative of the strikers.

192 NLRB at 387–88 (footnotes omitted).

Members Fanning and Brown dissented on this issue. They interpreted the Strike Settlement Agreements as providing that all strikers would continue to be recalled on a preferential basis until the complements were restored to pre-strike levels.

ment Agreements, a product of lawful collective bargaining, as embodying the reinstatement rights of the strikers. Although it reserved the right to override such a private agreement that waived statutory rights,[45] the Board saw acceptance of an agreement in certain circumstances as promoting the process of collective bargaining and deserving of protection:

> So long, therefore, as the period fixed by agreement for the reinstatement of economic strikers is not unreasonably short, is not intended to be discriminatory, or misused by either party with the object of accomplishing a discriminatory objective, was not insisted upon by the employer in order to undermine the status of the bargaining representative, and was the result of good-faith collective bargaining, the Board ought to accept the agreement of the parties as effectuating the policies of the Act which . . . includes as a principal objective encouragement of the practice and procedure of collective bargaining as a means of settling labor disputes.

192 NLRB at 388. In support of the conclusion that the Union could waive the reinstatement rights of its members, the Board cited cases upholding waiver of the right to strike. *Id.* at 386; *see Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

The question of whether a Union can waive the reinstatement rights of economic strikers was reserved by the Supreme Court in *Fleetwood,* 389 U.S. at 381 n. 8, 88 S.Ct. 543. Before this court, the Board contends that striker reinstatement is an appropriate area for bargaining—one in which both union and employer can secure concessions to their mutual advantage. The Union, on the other hand, argues strenuously that the statutory reinstatement rights represent a limit set by Congress on the risks to be borne by individual strikers. As such, they are not subject to waiver by a collective bargaining representative.

However, the issue of waiver by a union need not be decided in this case. In our view it is inaccurate to speak of statutory reinstatement rights having been waived here. The Supreme Court did not decide *Fleetwood* until 1967; the Board's decision in *Laidlaw* was not issued until 1968. We are at a loss to explain how the Union could make a knowing and voluntary [46] waiver of the rights created by those cases when it had no way of knowing what those rights were. As matters stood in 1960, it was clear that strikers whose positions had been filled by permanent replacements or whose jobs had been abolished on the date they applied for reinstatement were not entitled to preferential employment treatment at that or any future time. *Bartlett-Collins Company,* 110 NLRB 395 (1954), *enforced, American Flint Glass Workers Union v. NLRB,* 97 U.S.App.D.C. 244, 230 F.2d 212, *cert. denied,* 351 U.S. 988, 76 S.Ct. 1047, 100 L.Ed. 1501 (1956). *See also Brown & Root, Inc., supra.* The employer's duty was simply not to discriminate against former strikers in hiring new employees.

The law was less clear with respect to employees whose jobs were only temporarily unavailable at the time of their application for reinstatement, the situation considered by the Supreme Court in *Fleetwood.* To our knowledge, there was in 1960 no

---

**45.** The Board in fact did so on the same day as the decision in the instant case. *Laher Spring & Electric Car Corp.,* 192 NLRB 464 (1971). Finding that there was discriminatory intent on the part of the employer, the Board stated:

> Where such discriminatory manipulation has been shown . . . we are unwilling to accord the literal terms of the agreement final and determinative weight. The policies of the Act would hardly be effectuated by our deferring to an agreement, the terms of which have been used by Respondent in a manner as to cloak discrimination against strikers.

192 NLRB at 466.

**46.** We take this to be the appropriate standard for a waiver of statutory rights in this context. *See Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *American Bridge Division of United States Steel Corp.,* 206 NLRB 265 (1972). *Cf. Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

Board or court decision dealing with precisely those circumstances. The closest decision that we have discovered is *Atlas Storage Division*, 112 NLRB 1175 (1955), enforced sub nom. *Chauffeurs, Teamsters & Helpers "General" Local No. 200 v. NLRB*, 233 F.2d 233 (7th Cir. 1956). There the company had lost business during a strike, and the work of an economic striker had been absorbed by the other employees. As a consequence, the employer denied reinstatement. Three days thereafter, however, a position opened up when an employee was injured. The Board ruled that the employer was under no duty to offer the then vacant position to the former striker because his employment had been properly terminated when he had applied for reinstatement and it had been refused. 112 NLRB at 1180 n. 15. *Atlas Storage Division* can be read as applying only when an economic striker's job has been permanently eliminated by an employer. But there is a basis for concluding that the same rule should apply to temporary job unavailability, for in either case a striker could reasonably be expected to have an opportunity to regain a position with his employer. In any fairly sizable operation, employee turnover would assure that a job would eventually become available to economic strikers not immediately reinstated at the termination of a strike. This is true not only when a strike has caused a temporary cutback in business but also when a striker had been permanently replaced, or his job absorbed by other workers. As a consequence, as long as an employer did not fabricate temporary job unavailability as a means of discriminating against strikers, *Atlas Storage Division* gave reasonable grounds for concluding that in all instances the reinstatement right of an economic striker was to be determined when he applied for reinstatement. A panel of the Ninth Circuit (one judge dissenting) evidently thought

this to be so in *Fleetwood*,[47] although the Supreme Court ultimately disagreed. Moreover, it was the Supreme Court's decision in *Fleetwood* that induced the Board in *Laidlaw* to revise its longstanding position with regard to the reinstatement rights of permanently replaced strikers. If the Supreme Court in *Fleetwood* had not changed the law as it applied to reinstatement of economic strikers but instead simply reaffirmed long-established principles, we doubt that the case would have so immediately prompted the Board to change course and overrule three of its prior decisions (*Brown & Root, Inc., supra; Bartlett Collins Company, supra;* and *Atlas Storage Division, supra*).

For the reason that *Fleetwood*, like *Laidlaw*, in our opinion, established rights not existing in 1960, there could have been no knowing waiver of *Fleetwood* rights in this case. In addition, there is no question that the Union was under the impression that the principal reason that strikers would not be reinstated immediately was that they had been permanently replaced. Although the Strike Settlement Agreements left room for the operation of economic factors, the prospect of the complement remaining below pre-strike levels for the duration of the Agreement was never seriously discussed in negotiations. Thus, the issue of temporary job unavailability beyond the expiration of the Agreements was not a consideration. Under such circumstances, the Union could not have knowingly waived the statutory rights of its members.

Having determined that the Union could not have knowingly waived its members' later-acquired *Laidlaw* and *Fleetwood* rights, the fundamental question becomes whether *Fleetwood* and *Laidlaw* should be applied retroactively to 1960.[48] Whether retroactively to apply newly

---

47. *NLRB v. Fleetwood Trailer Co., Inc.*, 366 F.2d 126 (9th Cir.), *rev'd*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

48. Whether to give retroactive effect to administrative rules promulgated in agency adjudication is a question of law, and reviewing courts

are not obligated to grant any deference to the agency decision. *Retail, Wholesale and Department Store Union v. NLRB*, 151 U.S.App. D.C. 209, 466 F.2d 380, 390 (1972), *citing NLRB v. Guy F. Atkinson Co.*, 195 F.2d 141 (9th Cir. 1952).

adopted administrative rules is determined by balancing a variety of factors well summarized by Judge McGowan in *Retail, Wholesale and Department Store Union v. NLRB,* 151 U.S.App.D.C. 209, 466 F.2d 380, 390 (1972): "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law, (3) the extent to which the party against whom the rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite reliance of a party on the old standard." Taking these considerations into account, we find that retroactive application of *Laidlaw* and *Fleetwood* in this case would be unwarranted.

As previously noted, *Laidlaw* expressly overturned a well-established rule existing in 1960 that the reinstatement rights of permanently replaced strikers were determined at the time of application for re-employment. *Fleetwood* was not so abrupt a departure from precedent as *Laidlaw* in that the Board had not spoken to the precise issue presented in *Fleetwood*. But a reasonable reading of decisions existing in 1960, particularly *Atlas Storage Division, supra,* would be that the same rule applied to strikers whose jobs were temporarily unavailable at the close of the strike. Why, if an employer was not required to seek out employees whose jobs had been abolished or absorbed even though, as expressly recognized in *Atlas Storage Division,* vacancies would likely occur soon thereafter, should an employer be required to seek out those whose jobs would be unavailable for an indefinite period of time? Thus, even though *Fleetwood* did not expressly invalidate prior Board decisions, neither can it be concluded that the issue had been entirely an open one up until the time of that case. However obvious the correctness of the result in *Fleetwood* may seem to us now, we view the situation with which it dealt from a perspective fifteen years removed from the events occurring in this case.

At the termination of the strike, one could have concluded that those strikers whose jobs were not available when the strike terminated, whether because they had been permanently replaced or because of production dislocations caused by the strike, had no further statutory right to reinstatement, other than not to be discriminated against in favor of other new applicants for employment. Even treating the terms of the Strike Settlement Agreements as a collective application for reinstatement for the duration of the Agreements, when, on December 31, 1960, jobs were not available to certain strikers, the statutory reinstatement rights of those individuals were extinguished.

Because *Laidlaw* and *Fleetwood* imposed duties on employers which had not theretofore existed, it would be unjust to use those cases to impose liability fifteen years after the events at issue transpired.[49]

This is not a case in which the employer sought in bad faith to discriminate against strikers. Both the Board[50] and the district court in the 301 case found otherwise. Throughout the strike settlement process, the Company had the advice of experienced labor counsel. The Strike Settlement Agreements providing for the preferential recall of strikers to jobs in their seniority areas which they were qualified to perform

---

**49.** We are of course mindful that in *H. & F. Binch Co. Plant of Native Laces v. NLRB,* 456 F.2d 357 (2d Cir. 1972), this court did uphold a Board order applying *Laidlaw* retroactively. However, the failure to reinstate in *Binch* had occurred after the Supreme Court's decision in *Fleetwood* and this court noted:

"The Supreme Court's decision in *Fleetwood* should have demonstrated the erosion of employees' freedom in treating jobless economic

strikers as new applicants"; the extension in *Laidlaw* thus was hardly a great surprise. 456 F.2d at 365, *quoting American Machinery Corp. v. NLRB,* 424 F.2d 1321, 1328 (5th Cir. 1970). In contrast to *Binch,* the D.C. Circuit refused to apply *Laidlaw* to events occurring prior to *Fleetwood. Retail, Wholesale and Department Store Union v. NLRB,* 151 U.S.App. D.C. 209, 466 F.2d 380 (1972).

**50.** *See* discussion at note 55 *infra.*

exceeded requirements of existing law. Under these circumstances we are not at this stage disposed to permit imposition of a substantial liability upon the Company.

One final point remains to be made with respect to the post-Strike Settlement Agreement period. The Union contends that the Board failed to make a finding on the contention that those strikers not rehired by December 31, 1960, were subsequently discriminated against when they reapplied for employment. That any such discrimination would be unlawful is clear. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). However, the Trial Examiner made an express finding on this very point. Immediately after deciding that *Laidlaw* gave strikers not reinstated pursuant to the Agreements the right to remain in a preferred hiring status, and in the same paragraph, the Trial Examiner stated:

> [T]he evidence offered by the general counsel and charging parties is insufficient to find a pattern of discrimination against all employees named and listed in the complaint.

192 NLRB at 437. This must be read as referring to those strikers still unreinstated as of December 31. Moreover, it is a finding supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In January 1961 the Company sent letters to former strikers inviting them to apply for employment as new employees. Although the Company ultimately did not accept all these applications, from January 1 to April 30, 1961, at Pratt & Whitney the Company hired approximately 468 of those strikers reapplying for work. This figure contrasts with an approximate figure of less than 10% of non-striker applicants who were ultimately hired during the same period. At Hamilton Standard approximately 30% of strikers reapplying were hired.[51]

## C. The Period of the Strike Settlement Agreements

By the time the Trial Examiner issued his decision, he had the benefit of the district court's findings and conclusions in the section 301 case. The Examiner referred to that decision and noted that the General Counsel and the Union had relied on the same evidence to prove unfair labor practices as had been presented in the district court to support breach of contract claims. The Trial Examiner continued:

> In an overall consideration of the contracts and a masterly analysis of all the facts and circumstances of the situation [the district court] found that the [Company] carried out the Strike Settlement Agreements in good faith except in the two categories of transfers and promotions.

192 NLRB at 438.

It will be recalled that the district court found contractual violations in four separate types of transfers and promotions.[52] But immediately after making the statement quoted above, the Trial Examiner discussed only one of these areas: the "waiver" policy in which strikers recalled to other than their old jobs signed waivers of reinstatement in order to wait for a vacancy in their former job code; thereafter, when such a vacancy did occur, the Company transferred or promoted a striker into the vacancy in preference to the striker who had signed the waiver. The Trial Examiner found that such action also constituted a violation of section 8(a)(3) of the Act and thereafter stated: "Except as set forth

---

51. The Union and the General Counsel did not submit evidence of discrimination against individual strikers, relying instead on a pattern of discrimination.

52. The areas were: promotion of active employees within an occupational group and seniority area to jobs within the same group and area where senior registered strikers were awaiting recall; transfers of employees across occupational groups and seniority areas to jobs for which senior registered strikers were awaiting recall; transfer of certain trainees into jobs for which registered strikers were awaiting recall; and the Company's waiver policy discussed in the text. Not all these findings were appealed. See note 25 *supra.*

above . . . I find no merit in the contention that respondent otherwise discriminated against employees to discourage membership in a labor organization within the meaning of Section 8(a)(3) of the Act." *Id.* at 439.

In adopting the Trial Examiner's decision, the Board concluded that he had found violations of section 8(a)(3)[53] in all instances that the district court had found violations of the Strike Settlement Agreements. The Board also found that the Trial Examiner had adopted the findings of the district judge. Were we interpreting the Trial Examiner's admittedly ambiguous decision on a clean slate, we would conclude that the Trial Examiner found unfair labor practices in only one area, namely, the Company's waiver policy. Moreover, his findings seem to us to have been based on the evidence presented before him and not the record in the section 301 case, which had been placed in the judicial notice file.[54] But, being mindful of the Board's prerogative to modify the decision of the Trial Examiner, we do not care to take issue with the Board's interpretation.

The Board made an independent examination of the record in the 301 case and adopted the district court's basic finding that the Company acted in good faith throughout the period of the Agreements. Additionally, the Board concluded that production imbalance and parts shortages were the cause of the reduced complements and the concomitant failure to reinstate all strikers and were a substantial justification therefor.[55] The task of balancing employer justification against the infringement of employee right is the primary responsibility of the Board and not the courts. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *NLRB v. Great Dane Trailers Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). Having upheld the district court's principal factual findings, we also conclude that the Board's factual determinations are supported by substantial evidence. Nor are we disposed to disturb the Board's basic conclusion that the failure to restore full complements thereby reinstating all strikers, was itself not an unfair labor practice.[56] While adoption of the findings of the district court

**53.** Section 8(a)(3), 29 U.S.C. § 158(a)(3) (1970) provides in part:

> (a) It shall be an unfair labor practice for an employer—
>
> . . . . .
>
> (3) by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization . . . . .

**54.** It seems strange that the Trial Examiner would have adopted the findings of the district court after he had refused to admit the record into evidence (he instead placed it in the judicial notice file) and had expressly stated that the record would not be used as substantive evidence. Joint Appendix 1197.

**55.** The Board erred in stating that the 301 record had by agreement of the parties been placed in evidence before the Trial Examiner. The General Counsel and the Union sought to introduce it, but the Company strenuously objected, and as a result, the record was placed in the judicial notice file. However, the Company can now scarcely object to the use of the record by the Board to support the principal findings that the Company was motivated by legitimate and substantial business considerations in failing to restore the complements to pre-strike size. Both the district court and the

Board resolved this issue in favor of the Company. Insofar as the Board used the record to find that the Company committed unfair labor practices where it violated the Agreement, the Company will be able to voice its objections to the use of any particular portions of the record because, as discussed *infra*, we must remand for reconsideration in those areas where the Board found that certain promotions and transfers constituted unfair labor practices.

**56.** We do not think that the allocation of the burden of proof used by the district court and the Board is inconsistent with *Fleetwood's* direction that the burden of proving business justification for failure to reinstate strikers is on the employer. 389 U.S. at 379 n. 4, 88 S.Ct. 543. The Board found that the Company had borne the burden of going forward and rebutted the *prima facie* case of discrimination; The Union and General Counsel then failed to overcome that answer. Thus, the preponderance of the evidence remained on the side of the Company. The Supreme Court's concern in *Fleetwood* was that an employee not have the burden of himself showing the *lack* of business justification when all the proof relating to justification was in possession of the Company. It is incumbent on the Company to come forward with what evidence of justification that it

is unquestionably a novel approach to adjudication, because the Board made an independent examination and appraisal of the evidence, the procedure need not be condemned.

We have considerable difficulty, however, with the Board's conclusions with respect to promotions and transfers. It is unclear to us how the Board arrived at its conclusion. In addition to the ambiguous statements of the Trial Examiner, the Board's entire consideration of this matter consists of three sentences:

Based on the uncontradicted evidence before him, the Trial Examiner also concurred in the ruling of [the district court] in respect to the settlement agreement violations by the [Company] regarding transfers and promotions of junior employees, and found this conduct also constituted violations of section 8(a)(3). He suggested either accepting the court's identification of those discriminatees or holding a later hearing for that purpose. In agreeing with the Trial Examiner's finding of violations of Section 8(a)(3), we also find that it would avoid duplication of remedies if we adopted the identification of those discriminatees by the court.

192 NLRB at 385. A possible interpretation of this language is that *because* certain transfers and promotions violated the Agreements they also violated the Act; conversely, *because* there was no violation of the Agreements there was no violation of the Act. The latter is essentially the contention urged by Board counsel in this proceeding.[57] It would be consistent with the Board's theory that the Union waived any statutory reinstatement rights existing after December 31, 1960: that is to say, the recall Agreements were in all respects dispositive of the reinstatement rights of the strikers. However, Board counsel's explanation notwithstanding, it is not at all clear

that this was the Board's reasoning. The Trial Examiner apparently purported to make an independent assessment of whether the Act was violated by transfers and promotions. From the language quoted above, it appears that the Board did also. But if this be so, we are at a loss to explain how the Board reached its conclusion that some transfers and promotions were unfair labor practices and others were not. For example, why are transfers *across* seniority area lines which denied reinstatement to a striker (an 8(a)(3) violation according to the Board) any more likely to encourage or discourage membership in a labor organization than transfers *within* the same seniority area (not a violation of 8(a)(3)) which had the same effect? The same can be said for promotions and transfers of trainees (a violation) and apprentices (not a violation). There may be a reasonable basis for these conclusions, but without some further explanation by the Board, we cannot understand what it was. In short, if the Board made an independent assessment of the Company's administration of the recall Agreements, there has been a total failure to articulate the bases for its conclusions. The powers of the courts of appeals unfortunately do not include the ability to delve into the Board's collective mind and discern the ground for decision. For us to review a decision of the Board, it must disclose its reasoning. *See NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 442–44, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). The failure of the Board to do so requires denial of enforcement with respect to the 8(a)(3) findings and a remand for further consideration of those promotions and transfer policies asserted by the Union in its petition for review to have been unfair labor practices and not found by the Board to be such.

If, on the other hand, contrary to our reading of the Board opinion but in accordance with the interpretation ad-

---

might have. *Fleetwood* did not, as we read it, decide what party ultimately bore the risk of nonpersuasion in the event that after all the evidence is in the scale remains evenly balanced. The employer in *Fleetwood* had presented no evidence in justification. Fur-

thermore the Board's findings reveal that this was not a case in which the placement of the ultimate burden of persuasion was decisive of the outcome.

**57.** NLRB Brief at 35; Reply Brief at 12.

vanced by Board counsel, the findings of unfair labor practices (or absence thereof) were pinned directly to the presence or absence of a Strike Settlement Agreement violation, remand would be required for the Board at least to be given an opportunity to reconsider in light of the altered construction of the contract as in Part I of this opinion. It will be recalled that we determined that promotions and transfers of junior active employees violated the Agreements only when such transfer or promotion was not necessary to correct a production imbalance and avoid the layoff of an active employee. In our view, the Board, having exercised jurisdiction over the matter,[58] could have made an independent legal assessment of whether the conduct was violative of the Act. It was not sufficient for unfair labor practice purposes to say that certain conduct did not violate the Agreements, for the Board is by statute expressly empowered to override private arrangements.[59] 29 U.S.C. § 160(a) (1970); *see Lodge 743 v. United Aircraft Corp.*, 337 F.2d 5, 8–9 (1964), *cert. denied*, 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965). The Board found that the Agreements were the product of good-faith collective bargaining and not entered into with a discriminatory purpose. The written Strike Settlement Agreements here were simple documents; they did not on their face unambiguously resolve the myriad different interpretational questions that later arose during the actual recall process. The details of the administration of the Agreements, we suspect, were not considered by the parties until well after execution of the Agreements.

■ Although in some instances contractual violations may violate the Act as well, such as an outright refusal to reinstate any strikers after a promise to do so, coupled with the hiring of new employees, *see NLRB v. Roure-Dupont Mfg., Inc.*, 199 F.2d 631 (2d Cir. 1952), in this case, there has been no such disregard of contractual terms and discrimination against strikers. Under these circumstances a violation of section 8(a)(3) would not necessarily follow from a violation of the Agreements.

■ All of this is not to say that the Strike Settlement Agreements, as we have interpreted them here, cannot serve as a referent for the Board. Courts are after all obliged by *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), to endeavor to construe labor agreements so as to effectuate national labor policy. And the Board's unfair labor practice findings may well coincide with the breaches of the Agreement we have found. But the existence of these Agreements does not relieve the Board of its duty to determine whether the contract itself was unlawfully discriminatory within the meaning of the Act.[60]

■ Accordingly, we remand to the Board for further consideration of whether the actions of the Company taken in carrying out the Strike Settlement Agreements

---

**58.** We leave aside the question whether the Board might have, as a matter of discretion, declined to exercise its jurisdiction over conduct during the period of the Agreements alleged to have been unfair labor practices. *See Smith v. Evening News Association*, 371 U.S. 195, 198, 83 S.Ct. 267, 9 L.Ed.2d 246 n. 6 (1962). *Cf. Nabisco, Inc. v. NLRB*, 479 F.2d 770 (2d Cir. 1973) (approving the Board's deferral to the arbitration process).

**59.** Even if it is assumed that in 1960 the Company had no legal obligation to reinstate some of the strikers, such as those who had been permanently replaced, having undertaken to offer reinstatement, the Company could not discriminate against strikers in an unlawful manner. To take an extreme hypothetical example, an employer plainly could not refuse reinstatement to the leaders of a lawful strike while offering reinstatement to those strikers who had been less active in their support.

**60.** Our reasoning with respect to promotions and transfers applies equally to the Union contention preserved on review that the reinstatement of all nonstrikers absent during all or part of the strike violated the Act. The district court found that this did not violate the Strike Settlement Agreements, and we affirmed on this point. See Part ID *supra*. The Board did not find this to be an unfair labor practice but gave no reasons for this conclusion. On remand the Board should state the reasons for whatever conclusion it reaches.

might have constituted unfair labor practices.[61]

## D. Duty to Bargain in Good Faith

■ The Union raises two issues having to do with the duty to bargain in good faith imposed on the company by section 8(a)(5) of the Act. The first relates to the failure of the Company to provide certain information requested by the Union to aid it in policing the Strike Settlement Agreements.[62] The second involves the question of who should bear the cost of deletion of non-bargaining unit data from documents provided to the Union by the Company.

### 1. Failure to provide information

In October 1960 the Union wrote letters to the Company requesting listings of:

1. Employees whose jobs were filled by replacements during the strike;
2. Employees who were returned to their original jobs;
3. Employees recalled under paragraph 4(b) of the Agreements, showing their seniority status;

---

**61.** The Company has devoted the bulk of its 134-page brief in opposition to the Board's petition for enforcement to the contentions that the strike was unprotected (thereby negating the strikers' right to reinstatement) because it was caused and prolonged by the Union's unfair labor practices (in the form of bad-faith bargaining and strike-related violence), and that the entire Board proceeding was a violation of due process.

A sufficient answer to the first argument is that, except as to 50 strikers charged with serious misconduct whose cases were referred to arbitration, the Company never pleaded that its failure to reinstate strikers was in fact based upon the allegedly unprotected nature of the strike. Under those circumstances the allegations of bad-faith bargaining and general strike misconduct could not serve as a blanket defense to the section 8(a)(3) charges. *See Cone Bros. Contracting Co.,* 158 NLRB 186, 214 (1966) (misconduct of a striker constitutes a defense to failure to reinstate only if employer's refusal was in fact motivated by the misconduct). *Cf. Confectionery & Tobacco Drivers Union v. NLRB,* 312 F.2d 108, 112–13 (2d Cir. 1963).

As to the due process point, it is unquestionably true that the proceedings in this case were extremely lengthy. But by the same token the sheer numbers involved—approximately 6,500 registered strikers in plants employing some 20,000 people—were extraordinarily large and problems of proof of necessity correspondingly complex. Although the hearing with interruptions took five years, the proceedings in the district court, which were not as broadly based, took nearly eight years from the issuance of the complaint until a decision on the merits. Nor do we consider the vast majority of the charges to have been wholly frivolous, as the Company urges. Although the bulk of the charges was ultimately determined adversely to the Union, there was clearly room for reasonable men to have differences of opinion with respect to most of them. Likewise, the argument that the proceedings were intended merely to perpetuate the Union as the collective bargaining representative for employees at the plants loses force when it is considered that the Company voluntarily recognized the Union throughout most of the proceedings. The contention that the Board should have stayed its proceedings pending the outcome of the 301 case is also weakened by the failure of the Company to request it to do so. Furthermore, the Company's principal proposed basis for deferral—that the Board's findings paralleled those of the district court—only became apparent long after the hearing in this case when the decisions in the two cases had been rendered. The Board's findings were certainly not required to be parallel and indeed still ultimately may not be. While the Board might have as a matter of discretion stayed proceedings in the 301 case, it was not required to do so. Finally, while it is the duty of the Board not to condone undue delay in its processes and to take steps to eliminate it, we note the Supreme Court's observation in *NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 264–65, 90 S.Ct. 417, 421, 24 L.Ed.2d 405 (1969): "[T]he Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers."

**62.** It is by now well settled that the duty to bargain in good faith not only includes the obligation to provide a union with information relevant to the active bargaining, *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *NLRB v. General Electric Co.,* 418 F.2d 736 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970), but also information necessary and relevant to administer collective bargaining agreements already in force. *NLRB v. Acme Industrial Co.,* 385 U.S. 432 (1967); *United Aircraft Corp. v. NLRB,* 434 F.2d 1198 (2d Cir. 1970), *cert. denied,* 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *Prudential Insurance Company of America v. NLRB,* 412 F.2d 77 (2d Cir.), *cert. denied,* 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969).

4. Employees recalled under paragraph 4(c) of the Agreements, with seniority status;

5. Employees on the preferred hiring list who were awaiting recall, showing their seniority status in their occupational group and seniority area.[63]

Approximately a week later the Company responded as follows:

You now have in your possession the names of all striking employees who registered their desire to return to work, pursuant to the terms of this agreement—such information having been furnished to you by the Company in accordance with the request you made some time ago. No formal listings showing the information requested in your letter . . . are maintained by the Company. However, such data may be obtained through inspection of basic personnel records which are kept by the Company and the correlation of information so obtained with information already furnished by the Company.[64]

The letter went on to state that the Company would not itself analyze its records and compile the desired information but did offer to make the appropriate records available to the Union.[65] However, the Union declined to avail itself of this opportunity.

At this point, a brief discussion of the mechanics of administering the Agreements is in order. Because the Union's charges are directed most forcefully at Pratt & Whitney, allegedly the most flagrant violator of section 8(a)(5), this description will be confined principally to that division, although the procedure at Hamilton Standard did not differ materially. Immediately after the registration of all strikers desiring to return to work, a list of all registered strikers by job code and department was prepared. This list was intended to facilitate the

recall of strikers to their old jobs under Phase 1. This list was "very short-lived" and almost immediately incorporated into a new list, which showed registered strikers by seniority area and occupational group.[66] This list was then broken up and distributed to the fifteen or so personnel advisors who were in charge of the recall of strikers in various sections of the East Hartford plant. At that time it was apparently contemplated that this list would be the principal record utilized by the Company for the recall of strikers. Before the end of August, however, it became apparent to Morse, Pratt & Whitney's personnel manager, that the list method was simply unworkable. The daily volume of employees recalled was substantial. Because not all those employees upon becoming eligible for recall responded either quickly or positively to an offer of reinstatement, the notations, erasures, and deletions on the list destroyed its utility. Although the list was never formally abandoned, Morse devised a system whereby still unrecalled strikers were transferred to a fictitious "Plant 90" for administrative purposes (comparable in some respects to "Plant 500" which was traditionally used for absentees). Personnel advisors filled out change of status slips for strikers still unrecalled by the time all available jobs in an occupational group and seniority area had been filled. These slips, then arranged by seniority within a particular seniority area and occupational group, became the functional preferred hiring list.[67]

The Union contends that in light of the existence of the two lists already described, the Company's response to the October request was entirely unreasonable, and a breach of its duty to bargain in good faith. We disagree. While a better response by the Company would have at least described those materials, including the lists, used to

---

**63.** Joint Appendix (301 case) 1966.

**64.** *Id.* 1968.

**65.** The Company had responded in similar fashion to broad Union requests for information made in 1953, 1955, and 1958, *i. e.*, with an offer to make relevant records available.

**66.** Joint Appendix (301 case) 812.

**67.** *Id.* 814–15, 821. These lists were apparently destroyed by the Company although the date of destruction was never established.

administer the Agreements and being made available to the Union, the failure to do so in this case cannot be considered an unfair labor practice. The response of the Company was truthful, since in fact no formal listings of those recalled under the various phases were kept. The two lists did exist, to be sure, but by October Morse had long since concluded that the numerous markings and erasures had rendered them not a particularly useful tool for administering the Agreements. More importantly, the Company's response was not a refusal to supply information not existing in the precise form requested;[68] it was an invitation to the Union to examine those materials that the Company did have.[69]

█ The union refused, apparently because two previous efforts in the 1950's to obtain useful information from records provided by the Company had been overly burdensome. But that was no justification for concluding that information pertinent to the Strike Settlement Agreements would be similarly unavailing. The type of information desired in previous efforts had been for more extensive basic personnel and wage information on all employees in the unit. In contrast, the information sought by the October request was much narrower in scope. Moreover, by the very nature of the Strike Settlement Agreements, the Company would have had to devise some method, by list or otherwise, of segregating employees into occupational groups and seniority areas, for only then could the proper order of recall have been determined. Having itself steadfastly refused to examine what materials the Company might have provided, the Union cannot now charge the Company with an improper refusal to provide information. Morse testified in the 301 case that the Company would have provided the Union with the lists, had it accepted the invitation to examine records.[70] Presuma-

bly the change of status slip that constituted the preferred hiring list would have been provided as well. Failure to provide these basic records, which were obviously highly pertinent to the administration of the recall Agreements, after the Union had accepted the Company's invitation, plainly would have violated section 8(a)(5), but an inference that this is what would have occurred need not be drawn when the Union made no effort on its own behalf.

In November 1960, having still not examined Company documents relating to the administration of the Strike Settlement Agreements, the Union wrote a letter significantly expanding its information request. The Union sought *inter alia*, a current list of all employees in the bargaining unit with their dates of hire, classifications, job code, wage rates, shift assignments, departmental assignments, and their respective seniority, by department, occupational group, or seniority area. Also requested were special listings of employees hired since certain designated dates, for example, the date of the signing of the Strike Settlement Agreements. The request for a list of employees on the preferred hiring list was also reiterated.[71]

The Company again responded by letter: If you do not have sufficient information upon which to base an informed judgment as to whether the company is complying with the terms of our labor agreements, it is only because your union has ignored our repeated offers to make available to the union detailed information concerning all employees in the bargaining unit. We will not, as we have told you before, undertake the clerical work and analyses of records necessary to furnish you with such detailed information as you requested in your letter of November 11, 1960, and as you requested many times in the past.[72]

---

**68.** See *NLRB v. General Electric Co.*, 418 F.2d 736, 752 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

**69.** See *The Cincinnati Steel Castings Co.*, 86 NLRB 592 (1949).

**70.** Joint Appendix (301 case) 938.

**71.** *Id.* 1972–73.

**72.** *Id.* 1976.

The Union contends that this response was unlawful because it did not disclose the existence of a bi-weekly "Employee Service Record." This was a computer printout produced every two weeks for use principally in the wage and salary section of the personnel office. It grouped employees having the same job code in order of seniority—that is to say, employees identically situated within the Company were shown together on the list. In addition to job code, the printout also gave each employee's occupational code and seniority in terms of date hired and the number of weeks served. Certain wage and rating data was also included. The list had routinely been produced since about 1950; however, it was not part of the materials that the Company had agreed by contract to provide the Union, and its existence had never been disclosed. The Union first became aware of its existence only when it was mentioned by a Company data processing employee during the taking of a 1963 deposition.[73]

■ The Trial Examiner characterized the Union's request as "an effort to create and augment self-serving evidence to support [unfair labor practice] charges . . . rather than a bona fide request for essential information." 192 NLRB at 427. And, indeed, given the failure of the Union to respond to the Company's October offer to make information available, its reply to the Union's sweeping requests made in November cannot be considered a breach of the Company's statutory duty.[74]

■ The materials requested in the Union's October letters were obviously the information most relevant to the administra-

tion of the Agreements. Without the means to ascertain the relative seniority among registered strikers and the occupational groups of those still awaiting recall, the Union would have no way of knowing whether the recall of strikers was in accordance with the terms of the Agreements. As we have already observed, the Company's response to the October letter was under all the circumstances a reasonable one, and the Union at least had an obligation to test the Company's offer before charging it with failure to bargain in good faith. The Company's November response must be considered in light of the Union's own intransigence. Without current information on the strikers who had been recalled and those who remained on the preferred hiring list, the bi-weekly Employee Service Record would have been of no significant aid in policing the Strike Settlement Agreements. The bypass of an opportunity to obtain the tools basic to its policing of the Agreements rendered the Union's subsequent request overly broad and largely irrelevant for purposes of the Strike Settlement Agreements. It would be improper for the Union to use this subsequent request, which included more tangential materials, as the basis for an unfair labor practice charge when the Company's original response was adequate. Accordingly, we affirm the Board's conclusion that the Company did not violate section 8(a)(5).

## 2. Costs of Providing Information

■ We here deal with an issue not related to the 1960 strike and the Strike Settlement Agreements. In February 1964,

---

73. Before the Trial Examiner, the Union argued that the Company's failure to produce the "Employee Service Record" in response to the several comprehensive Union requests for information made in the 1950's was a violation of section 8(a)(5). The Union contended that the existence of the record had been fraudulently concealed, thereby tolling the statute of limitations. However, the Examiner ruled against the Union on this point, 192 NLRB at 424–25, and these pre-1960 matters have not been pursued here except by way of general background.

74. We need not decide whether in a different context the Company's failure to disclose the existence of the Employee Service Record would have been an unfair labor practice. That the list was not in the precise form requested by the Union would not alone relieve the Company of its obligation to disclose relevant and necessary information, where such information existed in some form useful to the Union. *NLRB v. General Electric Co.*, 418 F.2d 736, 752–53 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

after learning of the existence of the bi-weekly "Employee Service Record" and the comparable document at Hamilton Standard (the monthly "Personnel Data Listing"), the Union requested the Company not only to furnish it with copies of those documents on a continuing basis, but also to provide copies of a number of other Company personnel records, including such things as employee "put-on", "change of status", and "termination" slips that were routinely prepared by the Company personnel office.[75] The Company raised certain objections to providing this information, and a number of letters between the Company and the Union ensued. The final position of the Company was essentially that it would provide the records to the Union, but that the Union would have to pay the costs incurred thereby, including the cost of preparing the "Employee Service Record" and other documents by deletion of non-bargaining unit information contained in them.[76] This offer was not considered satisfactory, and the Board's General Counsel commenced a proceeding under section 10(j) of the Act [77] for an injunction compelling the production of the information requested. Thereafter, in a settlement of this 10(j) action, the parties stipulated that the Company would bear the costs attendant in supplying the information, pending an adjudication by the Board of its obligation to do so. The Union would in turn provide a surety bond to cover the costs in the event that the Board determined that they should be borne by the Union. The sum involved is not wholly insubstantial, having totaled approximately $50,000 in less than four years running from the summer of 1964 to the spring of 1968.

The Board ruled that for the Company to insist on Union payment for preparation and reproduction of Company records was not a violation of section 8(a)(5). As to the costs connected with the reproduction of personnel documents (both labor and materials), we fully agree with the Board's conclusion. This was not a one-shot request for information to aid in the negotiation of a particular point. The amount of material requested by the Union was substantial,[78] and copies were desired on a continuing basis. The Company could have made the documents available at reasonable times and places for the Union to copy them. *The Cincinnati Steel Castings Company*, 86 NLRB 592, 593 (1959). And under those circumstances, the Union would have had to pay the costs involved.

However, with respect to the cost of deletions of non-bargaining unit information from the "Employee Service Record" and certain other documents, we differ with the Board. Concededly, information on non-bargaining unit employees was not relevant to any purpose expressed by the Union, and accordingly, the Union had no statutory right to receive it.[79] But such information was deleted solely at the insistence of the Company. The Union was indifferent as to

---

**75.** "Put-on" slips were completed whenever a new employee commenced work; "change of status" slips were made out whenever an employee's status was altered by, for example, a pay increase, transfer, or promotion; and "termination slips" used when an employee was terminated, resigned, died, laid off, or retired. Other materials demanded by the Union were "Employee Ranking Lists," "Employee Performance Ratings," "Physical Demands Records," "Functional Capacity Records," and "Employee Classification Records."

**76.** The Pratt & Whitney "Employee Service Record" included in its listing employees not at the East Hartford plant and therefore not represented by Lodge 1746. It also included hourly employees such as plant guards and supervisors who, although employed at East Hartford, were not a part of the bargaining unit represented by the Lodge.

**77.** 29 U.S.C. § 160(j) (1970).

**78.** According to a letter sent by the Company to the Union and quoted by the Trial Examiner, personnel adjustments in the 16,000-employee bargaining unit at East Hartford annually generated several thousand "put-on" and "termination" slips and between forty and fifty thousand "change of status" slips. 192 NLRB at 434.

**79.** In contrast, the Board seems to have found that the information requested, insofar as it related to bargaining unit employees, was relevant and necessary, a conclusion not challenged by the Company. *See* 192 NLRB at 390.

whether it was included or not.[80] Moreover, the Company gave no reason for insisting on deletion, such as confidentiality or privilege,[81] beyond the fact that the Union had no statutory right to receive it. While the Company was certainly not required by the Act to make irrelevant information available, and therefore violated no statute by deleting it, neither did it have the right, for its own unspecified purposes, to in effect tax the Union on the receipt of information which was necessary and relevant to the Union's role as collective bargaining representative.[82] Accordingly, we hold that making the Union pay for the deletion of non-bargaining unit information was improper.

The record does not presently contain an accounting of costs incurred by the Company which is detailed enough to distinguish between reproduction and deletion costs. Unless the parties can agree on the breakdown, the amount owed by the Union will have to be determined by the Board during the compliance stage of this proceeding.

### E. The Company's Institution of a Civil Damage Suit

Without success, the Union contended before the Board that the Company's threat to file, and the actual filing of, a lawsuit to recover for property damage sustained as a result of striker violence restrained and coerced employees in violation of section 8(a)(1) of the Act. The Company ultimately received a favorable verdict in the Connecticut Superior Court in excess of 1.7 million dollars. The judgment was affirmed as to liability by the Connecticut Supreme Court but remanded on the damages issue. *United Aircraft Corp. v. International Association of Machinists*, 161

Conn. 79, 285 A.2d 330 (1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972).

Briefly, the pertinent facts as found by the Trial Examiner can be summarized as follows. As early as September 1960, Plato E. Papps, General Counsel for the Union, complained that the Company was not living up to the Strike Settlement Agreements and threatened to file 3,000 unfair labor practice charges. Company Vice President Martin Burke then retorted "I will sue you." The Union filed charges with the Board soon thereafter, but nothing more was said about a Company suit until a January 1962 meeting called by Company and Union officials for the purpose of negotiating an overall settlement of both the 301 breach of contract suit and the unfair labor practices filed with the Board. Then Burke said that the Company was going to sue the Union for strike-related property damage unless the entire controversy could be settled. After this meeting, further NLRB proceedings were postponed at the joint request of the Company and the Union. In December 1962, Burke again indicated in a telephone conversation with Papps that the Company was going to file suit against the Union unless the entire matter was settled. At a meeting soon thereafter, in January 1963, the parties again met to negotiate a settlement. The Company contended that only about 300 strikers had not been restored to work by that time and offered to open its records to the Union. Papps then told Burke that there was no point in going to the Company's offices to look at records because the district court would soon order the records produced. Burke then said that the Company was prepared to file suits against the

---

**80.** In its initial request for a copy of the "Employee Service Record," the Union expressly stated that the Company, if it so chose, could omit employees outside the bargaining unit. 192 NLRB at 429.

**81.** *See generally Emeryville Research Center, Shell Development Co. v. NLRB*, 441 F.2d 880 (9th Cir. 1971); *Texaco Inc. v. NLRB*, 407 F.2d 754 (7th Cir. 1969); *Kroger Co. v. NLRB*, 399

F.2d 455 (6th Cir. 1968); *American Cyanamid Co.*, 129 NLRB 683 (1960).

**82.** Testimony by a Pratt & Whitney data processing employee indicated that the computers could easily be reprogrammed to provide the "Employee Service Record" with non-bargaining unit employees deleted. Joint Appendix (301 case) 178.

Union for $15,000,000.[83] Papps offered $65,000 or $68,000, but his offer was ignored. After the January meeting, there were no further settlement discussions, and in May 1963, the Company filed its complaint in the Connecticut Superior Court.

On these facts, the Board determined that the Company had not violated section 8(a)(1). We agree.

A threat to file a lawsuit unless unfair labor practice charges are withdrawn can under certain circumstances violate the Act. *Clyde Taylor Co.*, 127 NLRB 103 (1960). However, here the Board determined that the Company's "threat to file such a suit unless an overall settlement agreement was reached was not the kind of 'tactic calculated to restrain employees in the exercise of rights guaranteed by the Act' envisaged by *Taylor* . . . . Rather, it appears to [have been] part of a good-faith attempt to negotiate a settlement of the numerous claims arising out of the bitter 1960 strike, with each party giving up its claims against the other." 192 NLRB at 384 (footnote omitted). There is ample support for this conclusion. The "threats" in this case were not conveyed by an employer to a single employee; they were an integral part of negotiations in which both sides were represented by sophisticated labor counsel who were more than familiar with the rights of the parties, and particularly the right to file unfair labor practice charges with the Board. *Cf. West Point Pepperell, Inc.*, 200 NLRB 1031 (1972). The grounds for the Company's suit were not fabricated, as subsequent events proved, and they were related to Union unfair labor practice charges in the sense that both arose out of the same strike. It was quite natural, therefore, that Company claims would be brought up and discussed in the overall settlement negotiations.

Likewise, the actual filing of the suit was not an unfair labor practice. The Board relied on *Clyde Taylor Co., supra*, which, in addition to holding that threatening a suit could be an unfair labor practice, also held that the actual institution of the suit did not violate the Act. On the latter point the Board reasoned that a contrary result would deny "the normal right of all persons to resort to the civil courts to obtain an adjudication of their claims." 127 NLRB at 108.

*Clyde Taylor* overruled *W. I. Carter & Bro.*, 90 NLRB 2020 (1950), and adopted the reasoning in the dissent of Chairman Herzog in that case. *Carter* had expressly recognized that the right to resort to the courts is not absolute, but rather limited by the law of malicious prosecution and abuse of process. *Id.* at 2024. On the other hand Chairman Herzog reasoned that despite the possible existence of an improper motive in bringing a suit, the "Board should accommodate its enforcement of the statute to the traditional right of all to bring their contentions to the attention of a judicial forum, rather than hold it to be an unfair labor practice for them to attempt to do so." *Id.* at 2029. The Union asks this court to hold that *Carter* was a sounder construction of the Act than the Board's more recent decision in *Taylor*. We conclude, however, that it is unnecessary for us to reach this issue. First of all, there is no evidence indicating that the suit was filed to induce the Union to withdraw its charges pending before the Board.[84] But even if we assume that the Company was improperly motivated—that it intended the suit to in-

---

**83.** The Union attaches some importance to the fact that never before had Company officials mentioned anything over $1,000,000. However, this escalation of the amounts involved cannot in this context form the basis of an unfair labor practice charge. Obviously Papps, an experienced lawyer, knew that if the Company filed suit it would seek the maximum damages possible and further that a court would not award more than was deserved.

**84.** In this connection, the Board quoted a finding of the Connecticut Superior Court that the Company did not "use these lawsuits for bargaining purposes to induce the defendants to withdraw their claims in the United States District Court. 70 LRRM 2577, 2580." 192 NLRB at 384 n. 13.

duce the Union to withdraw its charges—this alone would not make resort to the courts unlawful so as to justify an unfair labor practice finding. Abuse of process requires more than simply improper motive.[85] There must also be some action taken to utilize the court's processes for collateral purposes not related to the suit in question, for example, improper use of a subpoena. W. Prosser, Law of Torts § 121 at 857 (4th ed. 1971); F. Harper & F. James, The Law of Torts § 4.9 at 330–33 (1956). Here there is no indication that the Company did anything other than pursue the state proceedings to their proper conclusion. Accordingly, at least on these facts, the Board's reliance on *Clyde Taylor* was proper.

### F. Independent Violation of Section 8(a)(1)

The Board found that the Company violated section 8(a)(1) of the Act through the misconduct of five of its supervisors [86] and that these violations warranted remedial relief in the form of a cease and desist order and posting of a notice. The unlawful activities of the supervisors took place either during the strike or when it was imminent and consisted of threats, interrogation of employees, and offers of increased benefits to strikers if they returned to work. Having reviewed the Board's findings, we hold that there was ample basis for a conclusion that the conduct of the supervisors violated the Act. The Company asserts that these violations were trivial in the context of plants which employed approximately 20,000 people and including nearly 1,000 foremen and therefore did not warrant a remedial order. However, whether these violations warranted remedi-

al relief lies within the broad discretion granted to the Board by section 10(c) of the Act,[87] and we are not inclined to disturb the exercise of that discretion in this case. *See NLRB v. Long Island Airport Limousine Services Corp.*, 468 F.2d 292, 296 (2d Cir. 1972); *Luxuray of New York Division of Beaunit Corp. v. NLRB*, 447 F.2d 112, 114 (2d Cir. 1972).

The petition of the NLRB to enforce its order is granted insofar as the order relates to violations of section 8(a)(1) committed by Company supervisors. In all other respects the petition for enforcement is denied. The Union's petition for review is granted insofar as it relates to the promotion and transfer of active employees prior to December 31, 1960, the reinstatement of non-striker absentees, and the payment of costs of deleting certain information on documents provided to the Union, and the case is remanded to the Board for further proceedings consistent with this opinion. In all other respects the petition for review is denied.

The parties shall each bear their own costs incurred in connection with this appeal, except that the cost of printing the appendix shall be borne equally among the parties.

---

**85.** Since the Company unquestionably had probable cause to file a suit in this case, there is no allegation of malicious prosecution. Abuse of process, however, does not depend upon whether or not the action was brought without probable cause or upon the outcome of the litigation.

**86.** The complaint charged violations on the part of 64 supervisors.

**87.** 29 U.S.C. § 160(c) (1970).